Filed 3/20/23 P. v. Martinez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SERGIO MATHEW MARTINEZ,<br><br>    Defendant and Appellant. | F079274<br><br>(Super. Ct. No. 16CMS2699)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County. Louis F. Bissig[*] and Donna L. Tarter, Judges.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Timothy L. O'Hair, Henry J. Valle, and Dina Petrushenko, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

_____

[*]Retired judge of the Kings Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**INTRODUCTION**

Defendant Sergio Mathew Martinez, who was a minor at the time of the charged offenses, was tried in adult criminal court for the first degree murder of Sergio Cabral (§ 187, count 1) with related special circumstance allegations (§ 190.2, subd. (a)(21), (22)) and gang and firearm enhancements (§ 186.22, subd. (b); §§ 12022.5, subd. (a), 12022.53, subds. (b), (c), (d)). He was also charged with three counts of attempted, deliberate, and premeditated murder (§§ 664, 187, subd. (a); counts 2, 3, and 4) with related firearm (§ 12022.53, subds. (b), (c)) and gang allegations (§ 186.22, subd. (b)). (Further undesignated statutory references are to the Penal Code.) At the close of the People's case-in-chief, the court granted a defense motion for a directed verdict on counts 2 and 3.

The jury convicted defendant of first degree murder (count 1) and found the related enhancements and special circumstance allegations true. It acquitted defendant of count 4. Defendant moved for a new trial based on alleged juror misconduct. The court denied the motion. Defendant filed a motion for reconsideration of his new trial motion based on juror misconduct, attaching a juror affidavit. The court denied the motion and proceeded to sentencing.

On appeal, defendant raises multiple issues: (1) his right to a public trial was violated when his sister was excluded from the trial; (2) there was prejudicial juror misconduct; (3) the court erred in taking judicial notice of a witness's statements from the preliminary hearing; (4) the court improperly denied defendant's motion for continuance; (5) the court prejudicially erred in admitting a rap video into evidence; (6) the jury was not properly instructed with regard to considering defendant's youth in assessing the application of self-defense; (7) the prosecutor committed prejudicial misconduct; (8) the cumulative effect of the errors was prejudicial; (9) the special circumstances are unconstitutional; and (10) the matter should be remanded for the trial court to exercise its discretion regarding whether to impose a lesser firearm enhancement. In supplemental

briefing, defendant asserts the gang enhancement and gang special circumstance should be vacated pursuant to Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333). He further contends, at resentencing, changes to section 1385 resulting from the enactment of Senate Bill No. 81 (2021–2022) (Senate Bill 81) should apply. Finally, he argues he is entitled to a conditional reversal and remand for the juvenile court to conduct a new transfer hearing based on the modifications to the law enacted by the recent passage of Assembly Bill No. 2361 (2021–2022 Reg. Sess.) (Assembly Bill 2361). The People disagree with all of defendant's contentions, except they agree a conditional reversal and remand is required based on the passage of Assembly Bill 2361.

We reverse the gang enhancement and gang-murder special circumstance, conditionally reverse the remainder of the judgment, and remand to the juvenile court for a new transfer hearing and for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with the murder of Sergio Cabral, multiple counts of attempted murder, and multiple enhancements and special circumstances after he admitted to committing a shooting that resulted in Cabral's death.

*Procedural history*

Though defendant was a minor, the prosecutor initially filed defendant's case directly in adult criminal court. After Proposition 57 passed, the matter was transferred back to juvenile court and a transfer hearing was held. At the transfer hearing, the court found "the overall circumstances support a transfer of this case to adult court."

Accordingly, defendant was transferred from juvenile court to adult criminal court where he was charged with the first degree murder of Cabral (§ 187; count 1)[1] together with related special circumstance allegations (§ 190.2, subd. (a)(21), (22)) and gang and firearm enhancements (§§ 186.22, subd. (b), 12022.5, subd. (a), 12022.53, subds. (b), (c),

---

[1]There were separate allegations that that the murder was premeditated and that the murder was committed by means of discharging a firearm from a motor vehicle. (§ 189.)

3.

(d)). He was also charged with three counts of attempted, deliberate, and premeditated murder (§ 664, 187, subd. (a); counts 2 (related to Manuel Cabral), 3 (related to Miguel Rosales), and 4 (related to Ramon Perez) with related firearm (§ 12022.53, subds. (b), (c)) and gang allegations (§ 186.22, subd. (b)).

*Prosecution evidence*

### Shooting and death of Sergio Cabral

On August 20, 2016, Sergio Cabral was shot at an intersection in Avenal; he died as a result of the gunshot wounds. Ramon Perez was with Cabral when Cabral was shot. At the time, Perez and Cabral were walking in the intersection of Corcoran and Lassen; Miguel Rosales and Cabral's brother Manuel Cabral (Manuel) were walking with them and were about "two car lengths" away.

According to Perez, it was a normal day, "[n]othing out of the ordinary." They were walking "from the store"; at some point, they thought they saw someone they knew in a gray car, but they were mistaken. As they approached the intersection, a car pulled up at the same time. Perez and Cabral did not pay attention to the car, though Perez testified he thought it was the car they had seen earlier.

Perez and Cabral crossed the intersection and stepped up on the curb as the car stopped at a stop sign at the four-way stop. Perez and Cabral "were kind of towards the back end of the car" and "there was no interaction between nobody." Perez could not see in the car at all.

"[S]hooting started coming from the car." Perez and Cabral "took off." Cabral "staggered a little behind," then Perez saw Cabral fall. Perez did not see Cabral get hit; but he "just knew." Perez "took off … across the street …running." He "wanted to go get help and then come back."

Perez testified the shooter was shooting at him and Cabral, not the whole group as they were never in the same spot at one time. Rather, the other two "were so far ahead,"

4.

a "good distance" away; it was "mostly just [Perez] and [Cabral]." Perez felt the first shot was meant for him because he "was right there."

Perez never heard Cabral say anything to anyone in the car and he did not see Cabral make a gesture toward anybody in the car. He also did not see Cabral with any type of weapon or reaching for one. Perez denied doing anything to threaten anyone in the car.

G.M. testified Cabral was her boyfriend at the time he was shot. That day, G.M. was in her house talking to Cabral on the phone when G.M. heard gunshots in her window.[2] The phone was silent. A few seconds later, G.M. "heard someone scream that they shot him." G.M. said, "hello"; Cabral did not respond. G.M. ran outside. She saw Cabral face down on the ground. She approached him and tried to talk to him; he did not respond. G.M. turned Cabral's body over and his eyes were closed; one was really swollen, and he had some blood on his nose. G.M. put pressure on the side of Cabral's head where he was bleeding. She did not see a gun on or near his body.

G.M. testified Cabral did not seem angry when she was speaking to him on the phone. They were having a normal conversation; G.M. asked Cabral where he was going because they were supposed to meet up. She testified Cabral had an "A" tattoo on the back of his left hand, a "V" on one shin, and an "L" on the other shin. He also had an "A" tattooed on the back of his ear. The prosecution's gang expert, Officer Leopoldo Segura, testified the letters "AVL" stand for "Avenal Varrio Lomas," which is a Norteño criminal subset in Avenal. He explained Cabral was identified by law enforcement as a criminal street gang member.

A.R. heard the shooting; she had just walked into her mother's house on Corcoran. A.R. heard approximately three gunshots, a pause for a few seconds, and then approximately two more gunshots. A.R. looked outside the window and saw a gray car

---

[2]Notably, Perez testified Cabral did not take or make any phone calls at the intersection.

driving off "really fast." The prosecutor presented A.R. with a photograph of a car that A.R. testified was the exact style and color of the car she saw driving away.

S.B. also heard "quite a few" gunshots and then went outside. When S.B. got outside, she saw a man lying on his back and people screaming. The man was choking on his blood and struggling to breathe. S.B. rolled him onto his side to try to prevent him from choking on his blood; she did not know the man.

The pathologist who conducted an autopsy of Cabral's body observed five bullet holes, including an entrance wound through Cabral's ear and an exit wound through his forehead, an entrance wound a little below Cabral's armpit and the related exit wound, and an entrance gunshot wound on Cabral's right lower back with no exit wound; the slug was recovered from Cabral's pelvis. The pathologist testified, even though three bullets hit Cabral, the cause of Cabral's death was the single gunshot wound to the head.

**Christian Martinez's Testimony and Previous Statements**

Christian Martinez (Christian), defendant's brother, testified he and his other brother (Zachary) were in the car with defendant on the day of the shooting. Christian was in the backseat and Zachary was driving. About 20 to 30 minutes before the shooting, they pulled up at a stop sign in front of a liquor store. A group of four or five Northerners were coming out of the liquor store; they were "right next to the car," "steps away." The group included Manuel and Cabral.

The Northerners were "throwing up" gang signs at defendant and were "'talking shit to him'"; they were surrounding the car on defendant's side. Cabral was "the main one that started everything," "[h]e was standing in front of everybody." "One of the Northerners threw up a gang sign that was AVL," which is a known Norteño gang in Avenal. Christian testified he saw one of the Northerners lift up his shirt, symbolizing he had a gun or knife. Christian saw a "white guy with curly hair" flash a chrome gun, but he did not pull it out. The interaction lasted approximately two to three minutes. Christian believed the interaction went on for that long because the Northerners did not

6.

like defendant. Defendant did not respond; "he was just laughing." Christian thought defendant "was pretty upset" and that he "felt threatened when they told him stuff," but no one actually threatened defendant.

According to Christian, they ignored the Northerners and left to fill gas. Then, they "went for a little cruise around Avenal" and spotted the group of Northerners again walking across the street. Christian testified, as their car stopped at an intersection, the group "literally just surrounded the car. They … didn't take the crosswalk or anything, they just came towards us." Manuel "was the main one" saying things, mostly to defendant, and he was "the first guy that came up … throwing up his gang signs." There was another individual next to Manuel, and then Cabral and another male were towards the back of the car. When Manuel was finished, he went to the back. The group was "throwing up [gang signs for] AVL" with their hands. Christian did not see any of the individuals touch or try to hurt defendant.

At some point, Christian heard multiple shots fired; he ducked because he thought someone was shooting at them. Christian suddenly saw defendant shooting. The group of four was walking in front of defendant when defendant fired.

At trial, Christian testified "yes" when he was asked if he saw any of the four men at Corcoran and Lassen with any kind of a weapon. He admitted it was the first time he had mentioned that anyone besides defendant had a gun. And he was presented with his preliminary hearing testimony in which he denied seeing any of the four individuals at the intersection of Corcoran and Lassen with a gun.

Christian later testified he did not remember if defendant "really did it or if it was someone else." He denied seeing anyone get hit. He testified he just "stayed down"; he was "shocked" and "scared." At some point, Christian looked back and no one was on the ground, but then he looked back again and someone was on the ground.

Christian recalled being interviewed by Investigator Alfred Rivera and Officer Segura on the day of the shooting. Investigator Rivera stated Christian reported that he

7.

and his brothers were stopped at a stop sign outside of the liquor store when four individuals approached throwing or flashing gang signs. Investigator Rivera testified Christian never told him about a chrome handgun and, in fact, Christian did not "bring anything up about anyone having a gun." Christian also did not tell Investigator Rivera "anything that would provoke this" attack. Christian told Investigator Rivera the individuals made gestures at the liquor store half an hour before the shooting; but Christian said they did not make any gestures right before the shooting. Investigator Rivera noted he did ask Christian specifically if, at the liquor store, any of the individuals walking across the street had any weapons.

### Subsequent Investigation

Officer Chad Medeiros, Sergeant Edmonson, and Officer David Tapia responded to a call over dispatch at 15:48 hours regarding a male who was shot and lying in the roadway in Avenal. When Officer Medeiros arrived on the scene, he recognized the person on the ground as Cabral. Cabral was not moving or making any noise, and he had what appeared to be bullet holes in his forehead and lower chest area. Officer Medeiros saw multiple people with Cabral as he approached. He recognized two of the people from prior contacts as G.M. and Manuel, Cabral's brother. Officer Medeiros identified a photograph of the scene taken from his body camera that was introduced into evidence. He noticed Cabral had a tattoos of "V and L" on his shins.

Cabral was searched and everything was emptied out of his pockets; no firearm was located. Officer Medeiros searched for shell casings at the scene but did not find any. He observed a wall on the east side of the street where the shooting occurred that appeared to have a bullet hole in it. The windshield of a vehicle on the street also appeared to have been possibly struck by a bullet.

Jason Bietz was an investigator for the Kings County District Attorney's Office and was involved in the investigation of the shooting. Bietz was tasked with searching for a silver Chevy Malibu and eventually located one at approximately 7:00 p.m. heading

8.

in the opposite direction. Bietz was in an unmarked law enforcement car. He made a U-turn to follow the Malibu and noticed it was passing other cars at a high rate of speed. Bietz contacted the police department, confirmed the license plate number of the car he was following matched that of the suspect vehicle, and requested additional marked law enforcement units intercept the Chevy Malibu and conduct an investigative traffic stop. Additional units arrived and pulled over the Chevy Malibu.

Officer Medeiros learned the police had located a silver or gray Chevy Malibu on State Highway 269 in Avenal, within approximately 10 miles of where Cabral's body was found. Officer Medeiros assisted with detaining the people that were in the car; defendant was in the backseat on the passenger side. Officer Medeiros located an unloaded ProMag gun magazine, also known as a clip, on the rear seat inside the car. The prosecution introduced photographs of the car and the car's interior. Officer Medeiros also located a silver iPhone and a Samsung from inside the car. Officer Tapia located a pistol near State Highway 269 "within the same location where the traffic stop [of the Chevy Malibu] was conducted."

An officer transported defendant to the jail and retrieved his clothes and booked them into evidence. Defendant told the deputy doing the booking form that he was a Southern gang member, specifically a member of TLS.

After collecting evidence from the car, Officer Medeiros returned to the scene of the shooting and then the Avenal Police Department where he was informed "they were in the process of writing a search warrant for [defendant's] residence." Officer Medeiros went to defendant's home and searched defendant's dresser. He found "a loaded .357 Magnum round" and an expended "shell casing of a .38 Special."

The prosecution's gang expert, Officer Segura, was a detective at the time of the investigation. He contacted defendant at the police department approximately three to four hours after the shooting. Defendant had a "blue bandana on his person." Segura explained, "[r]egardless of whether they are Norteno gang members or Sureño gang

9.

members, blue or red bandanas is [*sic*] something that is often found on a gang member's person and that is … use[d] … to represent the color" of the gang of which the person is a member. He explained wearing or "flashing" a blue bandana would tell "other rival gang members or the general public that they are members of the Sureño gang." The police also recovered from defendant's "person," a piece of paper listing the "13 Bonds," which are the rules for Sureño gang members.

Segura interviewed defendant and the prosecutor introduced an audio recording of the interview at trial. Defendant confessed during the interview that he committed the shooting.

Defendant told Segura he first saw Cabral at Rice's Liquor Store in Avenal. Defendant then went to get gas at Amigos Gas Station, which is in Sureño territory that Sureños claim "as their own." Defendant then saw Cabral again at the intersection of Corcoran and Lassen, where defendant shot and killed him before leaving. Defendant reported the "people who were walking were demonstrating as if they were carrying some type of weapon," meaning they were reaching into their pockets as if they had a weapon. "In the past [defendant] had had several firearms pulled out on him; however, the people who pulled a firearm … out at him did not pull the trigger, and in this case [defendant said] … he had to … prove to the rival gang members that he is willing to pull the trigger," meaning he was willing to shoot people.

Segura explained defendant was stopped in a silver Chevy Malibu approximately four or five miles away from the location of the shooting. Segura opined, often times, firearms used in a specific crime will "be either traded or disposed of to conceal the evidentiary value … that particular firearm has."

An officer swabbed defendant's hands for gunshot residue immediately after defendant's interview with Officer Segura. A senior criminalist from the Department of Justice Bureau of Forensic Science explained at trial the results from the gunshot residue samples taken from defendant. From the gunshot residue "stubs," she "identified one

10.

characteristic gunshot residue particle on one of the hand samples, and … three particles that are consistent with gunshot residue on the hand samples." A particle classified as "characteristic gunshot residue" contains all three elements typically seen in conventional ammunition primers—lead, barium, and antimony. When only two of these elements are present, the particle is deemed to be "consistent with gunshot residue, which basically means it's probably gunshot residue, but there is a remote possibility that it could be from something else in the physical world." She explained, typically after four to six hours, there is very little gunshot residue left on the hands.

Vicente Guerrero, a latent print analyst, testified he examined latent prints taken from the magazine "related to the case." He compared the latent prints with defendant's palm prints and identified the latent prints as defendant's left palm; "they matched."

The prosecution also introduced images of a Facebook message exchange obtained from a search pursuant to a warrant of defendant's Facebook account. The message recipient's name was "PorosTownBEactive." In one message, defendant stated, in relevant part, "'I'm trying to trade my 357 for something else any of your homey's down to trade.'" Investigator Rivera testified a .357 Magnum handgun is commonly referred to in subculture as a 357. PorosTownBEactive responded, "'Does the 357 work'" and "'send a pic g.'" Defendant responded, "'Yeah it works g and look,'" with a photograph of a gun. PorosTownBEactive then said, "'wud u trade it for a nine,'" and "'I got 2 clips with it right now g,'" sending a picture of a gun resembling the gun defendant reportedly threw from the Chevy Malibu before he was arrested on August 20, 2016. Defendant responded, "'Yeah I'm down to trade it would kind of strap is that.'" PorosTownBEactive wrote back, "'Its a high point c9,'" and sent an address in Porterville. Defendant replied he was on his way and stated his gun was "automatic." The messages were exchanged on the afternoon of August 20, 2016.

An investigator for the district attorney's office, Chris Jackson, obtained and reviewed surveillance footage from a house on the corner of Lassen and Corcoran from

11.

August 20, 2016. Jackson testified the timestamp in the video was approximately an hour off. The prosecutor introduced an excerpt of the surveillance video into evidence. Jackson explained at timestamp 6:45:59 p.m., individuals can be seen walking towards the location where Cabral's body was later found. At timestamp 6:47:20, Jackson explained a silver Chevy Malibu can be seen behind a light pole ("kind of obscured") coming from south all the way north until it was out of view completely; Jackson explained the car was coming from the location where Cabral was found.

Jackson also explained the Avenal Police Department provided him an iPhone with photographs on it and Jackson verified the dates the photographs were taken. One photograph was a picture of defendant standing in a room holding a Ruger Security-Six .357 Magnum revolver; the file was created on the day of the shooting with a timestamp of 1534 hours (3:34 p.m.). Jackson also found a second photograph depicting defendant with the same firearm in his waistband; the file was created at the same time as the other photograph file. Jackson explained, the pictured firearm would not eject a bullet casing, the casing would stay inside the revolver. Officer Jackson extracted other content from the iPhone and saved it on a compact disc.

Jessica Winn with the Department of Justice Bureau of Forensic Services analyzed two bullets or projectiles and two cartridge cases (the remnant of a round fired from a gun) in this case. She analyzed their class characteristics and entered the information into a database that generated a report of possible firearms that fired them. The bullets and cartridge cases were consistent with revolver rounds fired by a Ruger, Smith and Wesson, Taurus, Herbert, or an off brand Herbert and Schmidt. Winn opined the gun pictured in the photograph defendant sent in the Facebook exchange was consistent with a Ruger revolver.

As part of the investigation into the August 20, 2016, shooting, law enforcement collected surveillance footage from the driveway of defendant's home that the prosecution introduced at trial. Investigator Rivera testified the footage was taken on

12.

August 4, 2016, and it depicts "two subjects on the far side of the video that kind of go across the screen" and "three subjects in the driveway" of defendant's residence. Rivera identified defendant, Christian, and David Villanueva running across the screen in the footage. He explained, "[T]here's some gestures made across from the two people crossing the street as well as the three people in the driveway. And at one point they … engage in a physical altercation."

Investigator Rivera testified he was also involved in the investigation of another incident that occurred the day before the shooting of Cabral. He personally saw bullets recovered from the area where police were dispatched. One victim reported gunfire hit the victim's house. Rivera explained David Villanueva was a person of interest in connection with the incident.

**Gang Evidence**

In 2015, Officer Segura was an investigator in the Kings County Gang Task Force assigned to Avenal. The task force conducted gang intervention and suppression and researched suspected gang members to present that information in court. Officer Segura had testified as a gang expert approximately five times regarding the "Avenal Varrios Lomas, AVL, which is the Norteno criminal street gang subset in the City of Avenal along with the Tiny Locos Sureños, TLS, criminal street gang subset for the Sureños."

Officer Segura explained, in Avenal, you most commonly see members of the Norteño and Sureño gangs. He explained the two gangs did not get along and, based on the gang subculture, they are rivals. Officer Segura testified Tiny Locos Sureños is a common Sureño subset found in Avenal that was associated with the larger Sureño gang related to the Mexican Mafia. It had "at least 30" members. He explained all the subsets worked together in conjunction with other gangs under the Sureño umbrella. The Tiny Locos Sureños associated with the color blue; all Sureños use the color blue. The following signs or symbols are commonly associated with the Tiny Locos Sureños: the letters "TLS," the word "Sur," "S-U-R," "South Side," the number 13, the Roman

13.

numeral for the number 13 "XIII," and "X3." Officer Segura testified the primary activities of the Tiny Locos Sureños "are burglaries, robberies, assaults with deadly weapons, possession of drugs for sales, auto theft, even murder." AVL, or Avenal Varrio Lomas, is a subset of the Norteño criminal street gang in Avenal and a rival of TLS.

Officer Segura explained: "'[P]utting in work' in the gang means earning your place within the gang through actions that specifically benefit that gang itself, whether it's monetary actions, selling drugs, or burglarizing residences, or whether it's committing crimes against the enemy and instilling enough fear and intimidation in the rivals to where often times [*sic*] the rivals won't even retaliate against them because of that severity of the crime." He opined, "[K]illing a rival gang member would probably be the … most prestigious … action that a gang member can commit, because they are eliminating a rival, therefore, the rival gang has less active members within the gang." Additionally, "within the gang subculture, they are often expected to, what gang members call, 'take flight,' which pretty much means if they see a rival gang member, you are supposed to attack that rival gang member on sight." "[T]he reason for that expectation is because they expect each gang member to act and to prove their worthiness to be part of a specific gang by certain actions, such as taking flight on a rival." He discussed the importance of respect in gang culture and explained signs of disrespect could include "a stare down or flashing rival gang signs, verbal words, or even letters if a rival gang member is vocalizing, for example, AVL, that is a sign of disrespect." Officer Segura also explained the concept of "snitching in gang culture." He explained, even if a gang member kills a rival gang member and a rival gang member witnesses it, he still is not allowed to snitch. "[H]is own gang will essentially push him out of the gang and discipline him for cooperating with law enforcement."

The prosecution introduced photographs of defendant that showed a "TLS" tattoo on defendant's right upper arm and three dots tattooed on the left outer web of defendant's hand. Officer Segura testified "TLS" is a sign or symbol of the Tiny Locos

14.

Sureños and it is common for members of Tiny Locos Sureños to get "TLS" tattooed on their bodies. They also introduced a photograph of defendant with a gun in his waistband and making a hand sign associated with "TLS."

Officer Segura reviewed the contents of a phone recovered from the Chevy Malibu in which defendant was stopped, including several videos on the phone. The prosecution presented a video from the phone of defendant burning a red bandana. Officer Segura opined the video was significant because, "respect is a huge aspect of the gang subculture, and with the defendant burning a red bandana that is the defendant directly— it's a manner of which the defendant is telling Nortenos that he is disrespecting them by essentially burning the—the red bandana or the color red, the color the Norteno criminal street gang represents."

There was also a photograph on the phone of "three possible males displaying gang signs, one of which has a blue bandana on his head, a blue bandana … concealing his face, and … what appears to be a revolver in his right hand." The "subject's left hand … is displaying what appears to be the letter T." "The second subject is in the back wearing a ball cap concealing his face with a blue bandana, and with his right hand … displaying the letter W." "And then the third subject is wearing a blue ball cap, a blue bandana concealing his face, a number 19 sports jersey, and with his right hand he is demonstrating a number 1 and with the left hand is demonstrating a number 3." Officer Segura testified he recognized defendant as one of the individuals pictured. He also found it significant the photograph was on defendant's phone, noting "it is very common especially in gang investigations for gang members to pose in gang photographs essentially showing off firearms, money, drugs, the gang lifestyle." It "goes to prove that members of a particular gang in this instance TLS do possess firearms, and it's essentially a … warning to not only the general public, law enforcement, but the rival gang members … if you challenge TLS this is what you will face."

15.

Officer Nate Estrada testified he contacted defendant on September 19, 2014. Defendant was wearing a hat with the letter "A" on it, a blue shirt, blue jeans, and had a cross tattoo on his right hand; he was with Noe Duran and Juan Contreras. Defendant stated he was "associated with TLS." Officer Randall Doherty testified he contacted defendant on November 21, 2014. Defendant was wearing a blue hooded sweater, blue jeans, and white tennis shoes. Officer Segura testified these contacts were significant in determining defendant is affiliated with a gang in that defendant was wearing blue, the color worn by Sureño gang members.

Officer Segura also personally contacted defendant in June 2015 with Raul Ramirez and Rafael Flores, who Officer Segura knew to be TLS members based on their prior admissions, their tattoos, and their clothing. Officer Segura testified, during this contact with defendant, defendant admitted he grew up around Sureños and he liked the lifestyle. Defendant admitted to Officer Segura "that he was walked in to the gang." Rafael Flores and Raul Ramirez began exchanging TLS Sureño gang signs at each other and when Officer Segura asked if they were active, they laughed and said, "'we're active as fuck.'"

Officer Segura contacted defendant again on February 4, 2016, after a school resource officer contacted the police about a physical fight in progress outside the high school. Defendant told Officer Segura he was involved "in a physical altercation with two male juveniles" who made gestures at him "like a neck slice," a sign of disrespect. Officer Segura explained, "[i]n the gang subculture as a gang member you are required to react to any type of disrespect, especially from rival gang members."

Officer Segura also testified, in the surveillance footage taken from defendant's home, numerous gang signs were displayed. In the video, defendant lifted his shirt to show the TLS tattoo on his arm to the people with whom he was fighting. At one point, defendant kneeled down and appeared to be demonstrating a "T," which is a sign or symbol of the Tiny Locos Sureños. Defendant also lifted the front of his shirt and made a

16.

motion towards the other two people "demonstrating he had a gun in his hand, and he pointed it at them." Officer Segura testified, in conducting an investigation into that incident, they were able to identify the other two people involved in the confrontation as AVL Norteño gang members.

The prosecutor posed Officer Segura with the following hypothetical scenario:

"I want you to assume that an admitted member of TLS is at Rice's Liquor in Avenal. While he's at the store a group of Nortenos are near him, I don't know how near them, but they are flashing gang signs of some type, they are disrespecting him. This caused the TLS member to feel disrespected.

"The TLS member then drove around town with his two brothers, and they got gas. 20 to 30 minutes after that initial interaction, the member of TLS drove up to a stop sign, saw the individuals that disrespected him crossing the street, and open fire [*sic*] at them. The … statement from the member of TLS was that he saw them talking shit so he whipped it out and shot six times.

"The TLS member admitted he knew the men were Northerners and was shooting from the passenger seat of the vehicle, and assume he had the intent to kill the group. Then the TLS member left Avenal went to Porterville and … exchanged that gun for a completely different gun. [¶] …¶]

"One of the group of Nortenos died. He was shot twice from behind, a bullet entering his ear and exiting his forehead killing him."

Officer Segura opined the crime in the hypothetical would benefit the Tiny Locos Sureños. "The fact that a rival gang member disrespected that TLS gang member, that called for immediate retaliation of some sort, whether a physical assault or something else. That would benefit the gang due to the fact that that goes to show rival gang members that TLS gang members will not be disrespected, and that will … not be tolerated and there will be repercussions for any form of disrespect." "[I]n essence it will instill fear and intimidation in the rival gang members because they will be afraid to disrespect Tiny Locos Surenos." He explained, the crime would "immediately accelerate the reputation of [the] TLS gang member [who fired] … for the mere fact that a rival

17.

gang member was murdered." When posed with additional facts that the murder was committed in broad daylight in a residential neighborhood, Officer Segura stated such circumstances "would make things even better for that gang member because it shows that … particular gang member is not afraid of any repercussions toward law enforcement. He's … proving to the fellow gang members that he is willing to go the extra mile to commit this type of crime in broad daylight in a residential neighborhood." The fact the victim was unarmed and not trying to hurt the TLS member showed "that TLS gang members are relentless and really aren't concerned whether or not their … rivals are armed or not. They are … required to attack a rival on sight, so he is essentially just doing … his part of being a gang member." The crime "would accelerate the reputation [of the whole TLS gang] because there is one less rival out there who is a threat to not only the gang itself but individual gang members, and in essence it's one less soldier the rival has."

Officer Segura noted, based on his experience, Rice's Liquor is in known Norteño territory and, in the hypothetical, the TLS member was willing to go there, hold his ground, and eventually retaliate for being disrespected there. He opined the crime furthered the activities of TLS in that the crime was "so heinous" that "it would likely instill enough fear and intimidation in the general public" that "they may be afraid to cooperate with [law enforcement] out of fear of retaliation from TLS gang members." The crime also made it easier for TLS to commit more crimes in the future in that it discourages citizen witnesses who witness a TLS gang member crime from cooperating with law enforcement out of fear of being killed.

Officer Segura also opined the hypothetical would be active participation in TLS—"[b]ecause this TLS gang member … was disrespected by a rival Norteno gang member, … he is expected to retaliate because if he does not, that shows weakness and weakness is not tolerated in the gang subculture. Therefore, … that gang member

shooting the rival in retaliation for the disrespect is direct active participation from the gang … he's essentially punishing him for what he did, disrespecting him."

**Evidence of Predicate Offenses**

Officer Abraham Avila testified he personally investigated an assault committed by Cesar Tadeo and Juan Flores on February 29, 2016, and he arrested Tadeo in connection with the incident. Notably, the court sustained objections to Officer Avila's testimony that Tadeo and Flores were both involved in the assault on a rival gang member and that both of them admitted they were associates or members of the Southern gang. Avila stated Tadeo informed him he "hung out" with Tiny Locos Sureños. The prosecution presented a certified packet related to Tadeo's wardship petition showing he was adjudicated for a violation of section 245, subdivision (a)(4) with a gang enhancement. The prosecution also submitted Flores's juvenile wardship petition showing he was adjudicated for a violation of section 245, subdivision (a)(4) with a gang enhancement.

At trial, Tadeo denied being a current or former member of the Tiny Locos Sureños. He also stated he was not aware of being put on probation for a February 29, 2016, assault with force likely to cause great bodily injury on a person with the initials J.C. Tadeo also stated he was not aware he admitted a gang enhancement under section 186.22, subdivision (b).

Officer Tapia testified he contacted Tadeo on January 23, 2016. Tadeo was with Josiah Arballo outside of a high school. Tadeo had a dirk or dagger, which is a knife, concealed on his person and he was wearing blue clothing at the time. Officer Tapia asked Tadeo about his gang affiliation and Tadeo stated he was not a Southern gang member, but he armed himself with the knife for protection from Northern gang members. Officer Rivera testified he contacted Tadeo in January 2016; Tadeo had the letters "TLS" written in blue ink on his left arm and the letter "X" and the number "3" written in blue ink in between his left thumb and index finger. Officer Avila contacted

19.

Tadeo on September 26, 2015. Officer Avila noticed "Tiny Locos Surenos" written on the railing of a balcony at Tadeo's home.

Officer Segura testified it was significant that Tiny Locos Surenos was written on Tadeo's balcony because Tadeo was "displaying that he is an active participant in a gang." He testified it was also significant the home had "fuck the police" displayed because gang subsets "rival the police who enforce the laws that the gangs violate." It was also significant Tadeo was contacted at a school campus armed with a knife, which "goes to show that TLS gang members arm themselves." Additionally, Tadeo's admission to Officer Tapia that he had a knife for protection against his rivals "tells me that he is an active participant in the Tiny Locos Surenos criminal street gang." He explained AVL is the Norteño criminal street gang subset in Avenal, and they are rivals of TLS.

Officer Avila testified he went to Juan Carlos Flores's home on September 26, 2016. Officer Avila saw "Sur 13" and "Varrio Tiny Locos" written on the entertainment center in Flores's room. Officer Rivera also contacted Flores in May 2015 and found "various writings" in Flores's bedroom that said "X3," S-U-R, "'the blue life,'" and "TLS." The letters "TLS" were also on a small cabinet in Flores's room; also found was a razor attached to a pen. In September 2015, Rivera contacted Flores again; Flores was wearing blue shoes and had a mail opener in his pocket that had been sharpened to be a double-sided blade.

Officer Segura testified, as an expert on TLS, it was significant that Flores had gang writings in his room. He explained "[t]he fact that gang writings are found in an individual's personal property or on their personal property … tells me that that person is displaying to others that he is … an active participant in a criminal street gang. In this case …, that individual is saying he is an active participant in TLS." He also testified Flores's blue shoes were significant because blue is a sign or symbol used by the Tiny Locos Sureños. The word "Sur" is also a sign or symbol of the Tiny Locos Sureños.

20.

Officer Segura opined Flores was a member of the Tiny Locos Sureños criminal street gang based on Flores's "contacts, his admission to being armed with various types of weapons, the graffiti found on his personal property, along with writings found in his possession."

The prosecution also introduced a photograph of defendant with an individual named Alfredo Ayala. Investigator Rivera testified he had investigated Ayala for prior gang-involved shootings and other drug-related offenses. He noted Ayala had a "TLS" tattoo across his chest. Officer Segura testified Ayala also has a tattoo of "NK," which means "Norteno killer," on his face.

Officer Segura was involved in an investigation that resulted in Ayala being convicted of attempted murder with a firearm. The prosecution admitted a certified information and abstract of judgment evidencing Ayala pleaded no contest to attempted murder and possession of a controlled substance with a loaded firearm with a gun enhancement in 2018 based on conduct alleged to have occurred on or about September 22, 2016. Officer Segura opined that Ayala is a member of Tiny Locos Sureños based on his contacts with him, the people with whom he was "in concert with during those contacts," Ayala's admission, his tattoos, and the clothing and colors he often wears. He also opined that assault with force likely to cause great bodily injury and attempted murder (a shooting) are primary activities of the Tiny Locos Sureños.

### Directed Verdict Granted on Counts 2 and 3

After the People rested, defense counsel moved for a directed verdict with regard to counts 2 and 3, which alleged attempted, deliberate, and premeditated murder (§ 664, subd. (a), 187, subd. (a)) of Manuel Cabral and Miguel Rosales, respectively. The defense asserted a reasonable jury could not find guilt beyond a reasonable doubt for these two charges.

21.

The court granted the motion. It found the evidence insufficient for a reasonable jury to find beyond a reasonable doubt that defendant committed attempted murder as to those individuals named in counts 2 and 3.

### *Defense Evidence*

Defendant testified on his own behalf regarding the August 20, 2016, incident. Defendant testified, that day, he and his brothers Zachary and Christian were driving; defendant was in the front passenger seat of the car. They stopped at a stop sign across the street from the liquor store. Defendant saw a group of four or five Northerners crossing the street from the liquor store. The group came up to the car and started taunting defendant. "[T]hey were kind of … surrounding the car" where defendant was located on the passenger side. The group was "throwing up gang signs," "looking at the car, getting near it." Defendant testified it "kind of looked like one of them lifted up their shirt," which scared defendant. "It looked like … he had something like a weapon or something." Defendant explained, when someone lifts up their shirt, it "shows that they have a gun." The other individuals were throwing gang signs. Defendant and his brothers drove off and went to the gas station to get gas. Then, they drove to a friend's house to pick him up, but he took too long so they left. So, they started driving around town.

At some point, defendant and his brothers "met up with the same people" as they were driving on Corcoran. As defendant's car stopped at a stop sign, the group was taunting him again. Defendant testified he "got scared because they were doing the same things," taunting him, throwing up their gang signs, trying to come up to the car, and "showing that they had—it kind of looked like they had weapons, … [s]howing that they had weapons" by lifting up their shirt. Defendant saw a chrome gun and it made him afraid. He later stated Cabral was the person he saw with the chrome gun; Cabral lifted his shirt and "he had [the gun] right … on his waistband." Defendant felt he "was in danger. Because you know when a gang member shows a gun sometimes they use it."

22.

"And when you are with your family, you know, you can't take that risk when you are a gang member and you have your family next to you." Defendant testified he "could have been" in immediate danger and that he knew he "was in danger"; he "didn't know if any of the other people there had a gun." He explained, "Flashing a gun at me, coming up to my car, of course … they were trying to harm us."

Defendant admitted he fired four, five, or maybe six shots in the group's direction. He denied he was angry when he shot; instead, he testified he was "scared." He was not aiming for anyone specifically; he "was just shooting to scare them away." Defendant testified he was trying to defend his family; he thought these men were going to kill him. He explained, "After all the things I have been through with them, gang members pointing guns at me, of course I'm going to be scared." He stated he shot Cabral three times because he was defending himself.

Defendant admitted on cross-examination that it would be important to tell the police he was defending himself, but he did not tell that to the police. He stated he was an active member of the gang TLS and there were "repercussions for snitching." However, he "snitched" to the police on himself, noting "there's nothing against that when you are an active gang member." He thought it was okay to tell the police he thought the individual walking had a gun, but not that he actually had a gun.

Defendant admitted he got rid of the gun after the shooting but stated he "already had intentions to get rid of the gun." He wanted to trade the gun for another one because he "felt like it." He testified the messages regarding the gun occurred hours before the murder. He explained he always had a gun on him for protection; he denied it was in case he saw a Northerner. He further testified that he got rid of another gun when he came back to Avenal because he did not want the police to find it.

Defendant denied the shooting furthered the activities of the Sureños, stating it "had really nothing to do with my gang life. [M]y self-defense had nothing to do with it,

23.

so it didn't really support the gang at all." He testified, "Even though I was an active gang member it was self-defense."

*Verdict*

The jury convicted defendant of the first degree murder of Sergio Cabral (count 1) and found true that the murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle intentionally at another person and persons outside the vehicle with the intent to inflict death, within the meaning of section 190.2, subdivision (a)(21) and that the murder was carried out to further the activities of the criminal street gang within the meaning of section 190.2, subdivision (a)(22). The jury also found true allegations count 1 was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)), that defendant personally used a firearm during its commission within the meaning of sections 12022.5, subdivision (a), and 12022.53, subdivision (b), that defendant personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (c), and that defendant personally and intentionally discharged a firearm that proximately caused death within the meaning of section 12022.53, subdivision (d).

The jury found defendant not guilty of attempted murder as to Ramon Perez, count 4, and acquitted defendant of the related lesser included offenses as to that count.

*Sentencing*

Before sentencing defendant, the court noted it reviewed *Miller v. Alabama* (2012) 567 U.S. 460 and considered "the distinction between children and adults, and the fact that they are constitutionally different in that, number one, children have a lack of maturity, and an undeveloped sense of responsibility leading to recklessness and impulsivity, and risk taking." "Two, children are more vulnerable to negative and outside pressure. They have limited control over their own environment, and lack the ability to extricate themselves [from] crime producing influences." "And three, the child's

24.

character is not well formed. Their traits are less fixed, and less likely to be evidence of irretrievable depravity."

The court concluded, "Based on the defendant's limited intellectual functioning, his lack of criminal record, the fact that he did obtain a GED while in custody, he proclaims himself to be a dropout. The fact that his mother failed to follow through with his counseling and CVRC services, which were factors outside of his control, the Court will not be imposing life without the possibility of parole."

Instead, the court sentenced defendant to 25 years to life as to count 1 for the violation of section 187, subdivision (a) with the enhancements pursuant to sections 186.22, subdivision (b)(5), and section 190.2, subdivision (a). The court struck the section 12022.5 enhancement and imposed an additional 25 years to life for the section 12022.53, subdivision (d) enhancement, for a total aggregate term of 50 years to life. The court noted, it considered that it had discretion to strike the firearm enhancement. However, "at 50 years to life [defendant] is still of a young age, he can still get out of custody if he behaves himself well in state prison. So the 50 years to life in the Court's opinion does not equate to life without the possibility of parole."

## DISCUSSION

### I.      Defendant's Right to a Public Trial Was Not Violated

Defendant first argues the court erred in excluding his sister from the trial without considering the requisite factors, thereby violating defendant's right to a public trial. We disagree.

#### A.      Relevant Background

On the second day of trial, the court took a recess before which it admonished the jury "not to talk about the case or about any of the people or any subject involved in it with anyone, including the—." The court was interrupted by a loud noise and indicated it would "take care of that." After the jury left the courtroom the following discussion took place:

"[THE COURT:] … Two of the spectators that were seated behind [defendant], I believe one is [defendant's] mother. Correct?

"THE DEFENDANT: No.

"[DEFENSE COUNSEL]: No, no.

"THE COURT: Okay. Not even close.

"[PROSECUTOR]: Is that the aunt?

"THE DEFENDANT: My mom's aunt.

"THE COURT: Your mom's—okay. Your mother's aunt. [¶] And then there was another younger person.

"THE DEFENDANT: My little sister.

"THE COURT: That's your little sister? [¶] All right. I believe it's your little sister that rushed out of the courtroom, slammed the door against the hallway causing a very loud noise, and then it was your aunt that then said it wasn't her. So I'm assuming it was your sister, she'll be precluded from coming back into this courtroom.

"I will talk to her and see if—I may change my mind, but right now she's not to come into the courtroom because of that disruption. That was in front of the jury."

Later, the court again noted there was "a little disturbance … right before we took a break. [Defendant's] … little sister left the courtroom." The court admonished, "she is not to come into the court" "until she talks to me." A voice (not attributed to a particular individual in the transcript) responded, "Okay." Defendant stated, "I'm sorry about that, ma'am." The court responded, "She needs to learn to calm down," and then engaged in the following exchange with defendant's sister:

"THE COURT: … Ma'am, what is your name? What is your name?

"VOICE NUMBER TWO: Destiny.

"THE COURT: Destiny, do you want to stay in this courtroom and watch this trial?

"VOICE NUMBER TWO: Um not really, I'd rather stay out.

26.

"THE COURT: Good. You are ordered to stay out then. Thank you.

"VOICE NUMBER TWO: All right.

"THE COURT: All right. So now you know who she is, if she comes in escort her outside."

## B.     Standard of Review and Applicable Law

"Every person charged with a criminal offense has a constitutional right to a public trial, that is a trial which is open to the general public at all times."[3] (*People v. Woodward*, *supra*, 4 Cal.4th at p. 382; see U.S. Const., amends. VI, XIV; Cal. Const. art. I, § 15; see also Pen. Code § 686, subd. 1.) "The Sixth Amendment public trial guarantee creates a 'presumption of openness' that can be rebutted only by a showing that exclusion of the public was necessary to protect some 'higher value,' such as the defendant's right to a fair trial, or the government's interest in preserving the confidentiality of the proceedings." (*People v. Woodward*, *supra*, at p. 383; accord, *Waller v. Georgia* (1984) 467 U.S. 39, 44–45 (*Waller*).) "Such circumstances will be rare, however, and the balance of interests must be struck with special care." (*Waller*, *supra*, at p. 45.) However, "both the defendant's and the public's right may be subjected to reasonable restrictions that are necessary or convenient to the orderly procedure of trial, and the trial court retains broad discretion to control courtroom proceedings in a manner directed toward promoting the safety of witnesses." (*People v. Pena* (2012) 207 Cal.App.4th 944, 949; *People v. Esquibel* (2008) 166 Cal.App.4th 539, 552.)

## C.     Analysis

Defendant argues, in *Waller*, *supra*, 467 U.S. 39, the Supreme Court identified four requirements that must be satisfied before public access to a criminal proceeding may be denied: (1) there must be "an overriding interest that is likely to be prejudiced" if

---

[3]"Because a defendant's state constitutional public trial right appears to be coextensive with the federal guarantee [citation], further general references to the 'public trial right' or 'public trial guarantee' are intended to include both the state and federal constitutional provisions." (*People v. Woodward* (1992) 4 Cal.4th 376, 381.)

the proceeding is left open; (2) the closure must be "no broader than necessary" to protect that interest; (3) the trial court "must consider reasonable alternatives to closing the proceeding"; and (4) the trial court must articulate the interest being protected and make specific findings sufficient for a reviewing court to determine whether the closure was proper. He asserts the court did not "attempt to, or satisfy a single *Waller*-factor before permanently prohibiting Destiny from attending [defendant's] trial." He argues the "courtroom closure—banning Destiny from ever returning to her brother's trial—was manifestly overbroad"; the court failed to consider any alternatives to banning her from attending the trial; and the court did not state a justification for excluding Destiny or identify an "overriding interest" that was likely to be prejudiced if she was not excluded. Defendant also asserts, that Destiny "wanted" to be excluded did not warrant the "court's drastic response," in part, because "Destiny could have not meant what she said, she could have changed her mind, or she could have made the choice not to attend the trial." We disagree with defendant's contentions.

First, defendant has forfeited his argument by failing to object below. "'A defendant "may, by his own acts or acquiescence, waive his right [to a public trial] and thereby preclude any subsequent challenge by him of an order excluding the public. Unlike the jury trial right which requires an express personal waiver [citation], the constitutional guarantee of a public trial may be waived by acquiescence of the defendant in an order of exclusion." [Citations.]'" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1237; accord, *People v. Catlin* (2001) 26 Cal.4th 81, 161.) And here, defense counsel did not object to the court's order excluding defendant's sister from the remainder of trial on the ground the order violated defendant's right to a public trial; thus, his claim is forfeited. (See *People v. Gonzales* (2012) 54 Cal.4th 1234, 1292, fn. 27 ["Defendant did not assert his right to a public trial below, so the trial court had no occasion to consider it. That claim of error was forfeited"]; *People v. Catlin*, *supra*, at p. 161 [defendant's failure to

28.

object that proceedings violated his right to a public trial "constitutes a waiver of the claim on appeal"].)

Irrespective, defendant's claim fails on its merits. "[T]he issue whether an accused has been denied his constitutional right to a public trial cannot be determined in the abstract, but must be determined by reference to the facts of the particular case." (*People v. Esquibel*, *supra*, 166 Cal.App.4th at p. 553.)

Considering the particular facts of the instant case, we cannot conclude defendant's right to a public trial was violated. Here, the court was admonishing the jury when it was interrupted by a loud noise. The court explained defendant's sister caused a "disruption" and stated she would be precluded from coming back into the courtroom as a result. However, the court then revised this statement, crafting a more limited remedy, advising that defendant's sister would need to speak to the court before being allowed to return. Thus, the court did not initially ban defendant's sister from attending the remainder of the trial, but rather pursued an alternative measure—the court advised that she was to speak with the court before being allowed to attend. However, when defendant's sister appeared before the court, she indicated she did not want to be present. Accordingly, in light of the disruption she caused and her representation that she did not want to be there, the court ordered her to be excluded.

We cannot conclude the court's order excluding defendant's sister under these circumstances violated defendant's right to a public trial. Rather, the court appropriately considered the need for a fair and orderly trial and imposed a narrow and tailored remedy in light of the disruption caused by defendant's sister and her express statement that she did not want to be present. (See *People v. Holloway* (2004) 33 Cal.4th 96, 148 ["The temporary exclusion of a single spectator, intended to prevent potentially disruptive displays, did not constitute a cognizable deprivation of the public trial right"]; accord, *People v. Woodward*, *supra*, 4 Cal.4th at p. 385 ["Trial courts possess broad power to control their courtrooms and maintain order and security"]; see also *People v. Virgil*,

*supra*, 51 Cal.4th at p. 1237 ["We have … held that even a partial or temporary exclusion of the public from certain proceedings, if justified, imposes no more than a de minimus restriction on the constitutional right to a public trial"].)

In *Waller*, the trial court granted the prosecution's request to close a lengthy suppression hearing, over the defendant's objection that the closure violated his Sixth Amendment right to a public trial. (*Waller*, *supra*, 467 U.S. at pp. 41–43.) The United States Supreme Court considered "the extent to which a hearing on a motion to suppress evidence may be closed to the public *over the objection of the defendant* consistently with the Sixth and Fourteenth Amendment right to a public trial." (*Id*. at pp. 40–41, italics added.) In considering the issue, the *Waller* court restated the "applicable rules": "'The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" (*Id*. at p. 45.) The *Waller* court held the defendant's right to a public trial was violated by the court's closing of the seven-day suppression hearing to the public. (*Id*. at p. 48.) The court reasoned "the State's proffer was not specific as to whose privacy interests might be infringed, how they would be infringed, what portions of the tapes might infringe them, and what portion of the evidence consisted of tapes [from wiretapped phone calls]. As a result, the trial court's findings were broad and general, and did not purport to justify closure of the entire hearing." (*Ibid*.) The trial court did not consider alternatives to immediate closure of the entire hearing, such as closing only those parts of the hearing that jeopardized the interests advanced. (*Id*. at pp. 48–49.) And the closure was "far more extensive than necessary" in that the wiretap call tapes, the basis for the closure, only lasted two and a half hours of the seven-day hearing and "few of them mentioned or involved parties not then before the court." (*Id*. at p. 49.)

*Waller* is inapposite. Initially, the conditional exclusion of a single disruptive spectator who indicated her desire not to attend trial—at issue here—is markedly different from the preemptive closure of the entire courtroom to all the public based on a limited privacy concern that was at issue in *Waller.* (See *People v. Woodward*, *supra*, 4 Cal.4th at pp. 384–385 [concluding temporary closure of courtroom to new spectators during closing argument did not violate defendant's right to a public trial and cited cases, including *Waller*, were inapposite, reasoning in part, "[u]nlike the situation in the public exclusion cases relied on by defendant, the courtroom was never cleared to remove all spectators for a significant period"]; see also *People v. Kocontes* (2022) 86 Cal.App.5th 787, 876 ["Courts have drawn a distinction between complete closures and partial closures"].) Additionally, *Waller* sets forth the procedures and findings necessary to close a court proceeding over "the objection[] of the accused." (See *Waller*, *supra*, 467 U.S. at p. 47 [holding, under the 6th Amend., any closure of a suppression hearing "over the objections of the accused" must meet articulated tests].) And as discussed, here, defendant did not object to the exclusion of his sister from the trial on any basis, including on the grounds that the exclusion violated his right to a public trial.

Furthermore, the exclusion of defendant's sister from the courtroom under the circumstances here did not implicate any of the rationales underlying the right to a public trial, particularly considering defendant's sister's representation that she did not even want to attend. "'"'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions….'"'" [Citations.] [¶] In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." (*Waller*, *supra*, 467 U.S. at p. 46, fn. omitted; see *People v. Woodward*, *supra*, 4 Cal.4th at p. 385.) Defendant's sister's exclusion from the courtroom under the circumstances in this case

31.

did not affect any of these goals. Rather, under the particular facts of this case, we cannot conclude defendant's right to a public trial was violated. (See *People v. Bui* (2010) 183 Cal.App.4th 675, 682 [noting "[t]he California Supreme Court has recognized … that not every closure of a trial or exclusion of certain spectators, rises to the level of a constitutional violation, and certain exclusions or closures are so 'de minimus' that they do not violate a defendant's constitutional public trial rights"]; accord, *People v. Woodward*, *supra*, at p. 385 [temporary closure of courtroom to new spectators during closing arguments did not implicate factors underlying public trial right]; see generally *Braun v. Powell* (7th Cir. 2000) 227 F.3d 908, 919 [concluding permanent exclusion of single spectator from trial "on the apparently mistaken belief that such an exclusion would enhance, not detract, from the integrity of the proceedings, does not implicate the policy concerns that inform the Sixth Amendment's right to an open trial"].)

We reject defendant's first contention.

## II.     Juror Misconduct

Defendant next asserts the verdict must be reversed because there was prejudicial juror misconduct. He argues "[o]verwhelming evidence establishes Juror #1 committed numerous types of serious misconduct," and the presumption of prejudice was not rebutted. We reject defendant's contention.

### A.     Relevant Factual Background

#### 1.     *Inquiry of Juror No. 1*

At the beginning of the third day of trial, outside of the jury's presence, the court reported "a juror contacted my bailiff and stated she was familiar with your witness, [prosecutor]," referring to Ramon Perez who was also the named target of the attempted murder count charged in count 4. The court stated, according to the juror, Perez is "the stepson of her sister, which makes him a stepnephew." The court told counsel it was going to call in the juror "and see if that's going to affect her ability to deliberate."

32.

Neither counsel objected.  The following exchange then took place between the court and the juror:

> "[THE COURT:]  {Juror No. [1]}, did you contact my bailiff yesterday?
>
> "JUROR NO. [1]:  Yes, I did.
>
> "THE COURT:  Okay. And it was regarding the—your relationship with Ramon–
>
> "JUROR NO. [1]:  Perez.
>
> "THE COURT:  —Perez?
>
> "JUROR NO. [1]:  Yes, ma'am.
>
> "THE COURT:  Okay.  It's my understanding that Mr. Ramon Perez would be considered your step-nephew sort of?
>
> "JUROR NO. [1]:  Kind of, yeah.  It's my sister's stepson.
>
> "THE COURT:  Okay.
>
> "JUROR NO. [1]:  Correct.
>
> "THE COURT:  All right.  So how well do you know Ramon Perez?
>
> "JUROR NO. [1]:  I haven't seen him in over a year and a half.  I know he has children, and I know his wife just got her LVN and works at a school.  That's all I know.
>
> "THE COURT:  All right.  And before this year and a half, prior to the year and a half since you have seen Mr. Perez, did you have a lot of contact with him?
>
> "JUROR NO. [1]:  No.
>
> "THE COURT:  How often would you see Mr. Perez prior to this year and a half where you didn't see him?
>
> "JUROR NO. [1]:  Maybe once.
>
> "THE COURT:  One time in—
>
> "JUROR NO. [1]:  Yeah.

33.

"THE COURT: In—

"JUROR NO. [1]: I don't see him at all. I mean—

"THE COURT: Okay. So you recognized him but you don't really—

"JUROR NO. [1]: Yes.

"THE COURT: It sounds like you don't really have a relationship with him.

"JUROR NO. [1]: I don't. But when I saw his face yesterday that's why I was concerned—

"THE COURT: Sure.

"JUROR NO. [1]: —and I wanted you to know.

"THE COURT: Well, I appreciate that. You did what you were supposed to do.

"So because the—the question is now that we know, would your relationship with Mr. Perez affect your ability to be fair and impartial in this case?

"JUROR NO. [1]: I believe I can.

"THE COURT: You believe you can? Okay.

"JUROR NO. [1]: Okay.

"THE COURT: Would your relationship with Mr. Perez affect your deliberations in any way?

"JUROR NO. [1]: No.

"THE COURT: All right. Have you talked about your relationship with Mr. Perez with any of the other jurors?

"JUROR NO. [1]: No.

"THE COURT: Okay. I'm going to ask that you continue not to discuss that issue with the other jurors. And I'm going to ask you to go back and join the other jurors okay? And I need to talk with the attorneys."

Juror No. 1 left the courtroom and the court asked counsel for their positions on the matter. Defense counsel made a motion to remove Juror No. 1 for cause. The court

34.

asked if, by doing so, defense counsel was agreeing to move forward with 11 jurors. Defense counsel disagreed and asked for a mistrial. The prosecutor argued, "[I]t seems like [Juror No. 1] can unequivocally state that she can be fair, this sounds like a very distant relative." He emphasized that Juror No. 1 "was certain that this would not affect her in any way." Defense counsel noted for the record, "[H]ad we known of [Juror No. 1's] relationship to a potential witness, … we certainly would have made a motion at the time of voir dire to strike her for cause, and … if that had been denied, we would have used one of our peremptories."

The court denied defense counsel's request for a mistrial. The court reasoned, "This juror has very little contact with Mr. Ramon Perez, prior to a year and a half ago she had one contact with him and recently very little contact, and said that that relationship would not affect her ability or would not affect her deliberation, that she could be fair and impartial. So the Court will deny the request."

Later that day, the court recalled Juror No. 1 to ask her about her relationship with her sister "to see if it's a close relationship." The court noted there are "a lot of cases that seem to indicate if there's a close relationship there may be a problem." Defense counsel noted for the record that Juror No. 1's relationship related to a witness who was also the person named in count 4. The court then asked Juror No. 1 additional questions about her relationship to her sister and ability to serve as a fair and impartial juror:

"THE COURT: Do you have a close relationship with [your sister, Ramon Perez's stepmother]?

"JUROR NO. [1]: She recently moved back from New Mexico so I have seen her maybe five times in the last four months.

"THE COURT: Okay. Do you consider that to be a close relationship?

"JUROR NO. [1]: For me and my sister?

"THE COURT: Sure.

"JUROR NO. [1]: Yeah, we're close.

35.

"THE COURT:  Okay.

"JUROR NO. [1]:  Yeah.

"THE COURT:  And would your relationship with your sister affect your ability to be fair and impartial in this case, realizing that Ramon Perez is a named victim in this case.  Do you understand that?

"JUROR NO. [1]:  You want to know if it's going to affect my relationship?

"THE COURT:  No, I want to know if it's going to affect your ability in this case to render a verdict—

"JUROR NO. [1]:  Definitely not, no.

"THE COURT:  Okay. So you actually have interrupted me, which is fine—

"JUROR NO. [1]:  I'm sorry.

"THE COURT:  No, that's just because it sounds to me like you have a strong conviction—

"JUROR NO. [1]:  Yes.

"THE COURT:  —that you would not let the relationship with your sister and your relationship with Ramon Perez impact your decision. Correct?

"JUROR NO. [1]:  Correct, ma'am.

"THE COURT:  In other words, and—if the People have not proved their case beyond a reasonable doubt, you would be able to find [defendant] not guilty; is that correct?

"JUROR NO. [1]:  Correct.

"THE COURT:  And if the District Attorney were to prove beyond a reasonable doubt the charges, you would be able to convict [defendant]; is that correct?

"JUROR NO. [1]:  Correct, ma'am.

"THE COURT:  And, again, there's nothing about the relationship with Mr. Perez, your sister's stepson—

36.

"JUROR NO. [1]: Stepson.

"THE COURT: —and your sister and that family that would affect your ability to be fair and impartial?

"JUROR NO. [1]: Yes.

"THE COURT: Is that correct?

"JUROR NO. [1]: Correct.

"THE COURT: Okay. Thank you, ma'am."

Defense counsel renewed his motion for a mistrial, stating, "I don't believe, despite her reassurances, that she can be fair given the relationship and given the fact that this individual is a named victim in the Information. …I believe it will be impossible for her to be fair despite what she may say."

The court denied the motion for a mistrial. It stated it would "take [Juror 1]'s statement at face value that she can be fair. Not only did she say she can be fair, but she is—she seems to have quite a conviction that she can be fair."

Throughout the trial and before deliberations, the court repeatedly admonished the jury that "you are not to talk about the case or about any of the people or any subject involved in it with anyone, including the other jurors, and you are not to make up your mind about the verdict or any issues until after you have discussed the case with the other jurors during deliberations."

### 2. *Disclosure of Juror Information and Motion for New Trial*

After the trial was over, defense counsel moved to continue a subsequent hearing, stating "[a]dditional time is needed to prepare and file a motion for a new trial based on Juror Misconduct and for motions to be made for release of juror identifying information." (Boldface and underscoring omitted.) The motion explained, "After the trial one of the Jurors … in the Jury trial for [defendant's] case came forward to report that Juror #1 reportedly failed to follow the Judge[']s order not to discuss the case prior to deliberation, and informed other Jurors that she had formed opinions about the evidence[]

37.

prior to deliberation, and that she did not participate in deliberations with an open mind and prejudged the case prior to deliberating." (Boldface and underscoring omitted.) In an attached declaration, defense counsel averred that a juror provided his office with information regarding juror misconduct and he needed additional time to properly investigate the statements, to file a motion to disclose juror identifying information for the remaining jurors, and to prepare a motion for new trial. Defense counsel also filed a motion for disclosure of juror identifying information.

The People opposed both motions. In their opposition to the motion for disclosure of juror identifying information, the People argued the alleged misconduct "appears to be extremely minor, and solely the opinion of one juror." They asserted the reporting juror informed the district attorney's office's investigator that the "'discussion' before deliberation was just a comment by juror #1 'He's stupid, isn't he?'" and the reporting juror "personally believed that juror #1 had already made up her mind." The People attached the investigator's report to their opposition.

In the report, the investigator recounted his conversation with the reporting juror, noting the juror told the defense investigator "Juror #1 was related to one of the witnesses and she had said, 'He's stupid, isn't he?' referring to the defendant." The reporting juror stated he "reached out to the defendant's family via facebook a couple days after the trial because he did not feel the defendant got a 100% fair trial based on the fact one of the jurors was related to one of the witnesses." The juror also reported, "Juror #1 brought up the familial relationship during the trial and the Judge decided to keep her on the jury." "When asked if there was anything else that led him to believe the defendant did not get a fair trial," the juror "mentioned Juror #1 talking down about the defendant and he felt she had already made up her mind." The juror "specifically said this was his opinion and not based on anything else."

The court granted defendant's motion for a continuance and his motion to disclose juror identifying information despite the People's opposition to both. The court

concluded there was a "sufficient showing to support a reasonable belief that juror misconduct has occurred." Accordingly, the court granted defense counsel's request and set a hearing in accordance with Code of Procedure section 237. The court set a date for jurors to object to the disclosure of their information. Approximately two months later, the court held a hearing regarding the disclosure of juror identification information. The court noted it had received seven responses objecting to the release of information. The court ordered the release of identifying information for the remaining jurors.

### 3. *Motion for New Trial Proceedings*

Defendant filed a motion for new trial based, in part, on alleged juror misconduct, attaching the district attorney investigator's report regarding his conversation with the reporting juror. The People opposed the motion. The People attached to their opposition a report from the district attorney investigator, who contacted the jurors whose contact information was provided, and a declaration from the prosecutor that the investigator provided the report regarding his conversations with the jurors whose contact information was disclosed. According to the report, three jurors agreed to speak to the investigator, and all denied witnessing any inappropriate behavior by any other juror that suggested defendant did not receive a fair trial. The record does not reflect defendant objected to the trial court's consideration of the investigator's report.

The court then held a joint hearing on defendant's motion for new trial and explained that the motion was based on alleged juror misconduct. Specifically, there was an allegation by Juror No. 9 that defendant did not get a fair trial based on Juror No. 1's comment that defendant was stupid. Juror No. 9 "felt that [Juror No. 1] had already made up her mind." The court noted, both sides investigated the issue, and "this allegation was not corroborated by any other jurors that were interviewed."

The court denied the motion for new trial explaining its reasoning:

> "The facts that the Court is relying on in making this ruling consists of the declarations and the investigation attached to the motions. For the purpose of the motion the Court will assume that [Juror No. 1] did in fact

39.

make that statement. However, it is unclear when that statement was made, either predeliberation or during deliberation. The allegation that [Juror No. 1] did not participate in deliberation with an open mind is not supported by the evidence. Any statement by [Juror No. 9] regarding this issue consists of his feelings and speculation and his opinion, and is not admissible.

"Further when questioned [Juror No. 1] stated she could be fair, and in fact acquitted the defendant on the attempted murder regarding the witness that she had a relationship with. The Court does find that there is insufficient evidence to conclude that there are [*sic*] juror misconduct.

"Assuming for the sake of argument that the juror made the statement predeliberation, which could be construed as misconduct for failing to follow the Court's order not to discuss the case prior to deliberation, prejudice would then be presumed. This presumption is rebutted by sufficient evidence of the defendant's guilt as follows:

"The recorded statement made by the defendant, photograph of the defendant holding the murder weapon, the defendant wearing the same clothes when arrested. The defendant was identified in court as the shooter by other witnesses.. And most importantly the defendant took the stand and admitted he was the shooter. These facts negate any presumption of prejudice, and therefore the motion for new trial is denied."

Before sentencing, the defense filed a motion for reconsideration of the motion for new trial. Defense counsel explained to the court that "it is basically the same motion"; however, it includes a sworn declaration of Juror No. 9 under penalty of perjury. The motion also included an attached declaration by defense counsel in which he stated, at the hearing on the motion for new trial, he "had a witness that was available to testify regarding juror misconduct" but, before the hearing, the presiding judge "indicated that she did not wish to question the witness because the substance of his testimony had been thoroughly covered in the moving papers by both the Defense and the Prosecution." He asserted, because the witness's statements were not admitted as evidence at trial or in an affidavit, they were not part of the record. Accordingly, he averred, the affidavit from the juror attached to the motion for reconsideration provided new factual information necessary to preserve the record and to provide grounds for a new trial. The court denied the motion for reconsideration.

40.

## B. Standard of Review and Applicable Law

"We review independently the trial court's denial of a new trial motion based on alleged juror misconduct. [Citation.] However, we will "'accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'"" (*People v. Gamache* (2010) 48 Cal.4th 347, 396.) "Under California law, if a juror's partiality would have constituted grounds for a challenge for cause during jury selection, or for discharge during trial, but the juror's concealment of such a state of mind is not discovered until after trial and verdict, the juror's actual bias constitutes misconduct that warrants a new trial under … section 1181, subdivision 3. [Citations.]" (*People v. Nesler* (1997) 16 Cal.4th 561, 581.)

Jurors may not "converse among themselves … on any subject connected with the trial" or "form or express any opinion about the case until the cause is finally submitted to them." (§ 1122, subds. (a)(1), (b).) A violation of the court's instructions constitutes misconduct. (See *People v. Lavender* (2014) 60 Cal.4th 679, 687.) "'"Misconduct by a juror … usually raises a rebuttable 'presumption' of prejudice."'" (*People v. Loker* (2008) 44 Cal.4th 691, 746–747.) "[W]e determine whether an individual verdict must be reversed for jury misconduct by applying a substantial likelihood test. That is, the 'presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.'" (*In re Boyette* (2013) 56 Cal.4th 866, 889–890.)

"'Whether prejudice arose from juror misconduct … is a mixed question of law and fact subject to an appellate court's independent determination.' … However, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'" (*People v. Danks* (2004) 32 Cal.4th 269, 303–304; accord, *People v. Lavender*, *supra*, 60 Cal.4th at p. 687 [we review

41.

"independently the question whether prejudice from juror misconduct has been rebutted"]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1425 [similar].)

## C.    Analysis

Defendant contends the court "did not correctly analyze the issues related to Juror #1's misconduct nor did it apply the correct standard when it found the presumption of prejudice had been rebutted." He asserts the court correctly found Juror No. 1 committed misconduct by discussing the case or parties prior to deliberations in saying, "'He's stupid isn't he,'" referring to defendant, and that prejudice was presumed. However, he argues, in denying his motion for new trial, the court failed to address or "consider … that Juror #1's statement **itself** also constituted misconduct" because it evinced that Juror No. 1 had an "actual bias and antipathy" toward defendant. He asserts Juror No. 1's comment reflects she had prejudged the case prior to deliberations. Defendant also alleges Juror No. 1 committed misconduct by revealing her relationship to Ramon Perez, directly contrary to the court's order. Relatedly, defendant contends Juror No. 1 "should not have been allowed to remain on the jury given her close relationship with her sister, Perez's step-mother." He argues the court "manifestly applied the wrong test of prejudice" in concluding the presumption of prejudice had been rebutted. He contends the court erred in considering the strength of the evidence of defendant's guilt and the jury's acquittal of defendant of count 4 in concluding the presumption of prejudice was rebutted. He further asserts "[d]enial of the right to an unbiased jury is structural error."

The People respond, in part, that we should accept the trial court's factual finding that there was no showing of misconduct. They assert the evidence presented in favor of defendant's initial motion for new trial was "limited to a statement filtered through two layers of hearsay: Defense counsel heard from Juror 9 that Juror 9 heard Juror 1 say something inappropriate at some point in time." They concede the prosecution presented a similar report based on multiple layers of hearsay and note, by the time of the actual hearing on the motion, "the prosecution presented a supplemental narrative based on

42.

interviews with three jurors who said that they heard nothing inappropriate." They argue, the court found no misconduct had occurred and the court was within its "discretion to reject hearsay in making its factual findings, especially when three other jurors made statements contrary to the ones made by Juror 9." As to the motion for reconsideration, the People assert the evidence was not credited by the fact finder, and we should defer to that determination. Alternatively, they assert the alleged instance of misconduct regarding Juror No. 1's statement was not inherently indicative of bias that would substantially influence Juror No. 1, nor did it give rise to a substantial likelihood of actual bias. Finally, they argue, even if the "trial court incorrectly pointed to the strength of the evidence as a factor that rendered any error nonprejudicial," reversal is not required because the trial court's decision was correct, though the reason stated was wrong. For the reasons that follow, we reject defendant's contention that the verdict must be reversed based upon prejudicial juror misconduct.

Here, there were two alleged instances of misconduct: (1) a statement made by Juror No. 1 referring to defendant as "stupid," and (2) Juror No. 1's alleged disclosure of her connection to Perez, a witness and named victim in count 4.[4] The parties dispute whether the trial court found the alleged conduct to have actually occurred.

Contrary to the parties' contentions, the record before us does not reflect the court made a factual finding as to whether the alleged instances of misconduct were true. Rather, the court, stated, "For the purpose of the motion the Court will *assume* that [Juror No. 1] did in fact make that statement [referring to defendant as 'stupid']. However, it is

---

[4]On appeal, both parties point out, but do not directly challenge, the opposing party's reliance—both, in support of the motion for new trial and the opposition thereto—upon evidence comprising hearsay—namely, Investigator Jason Bietz's unsworn reports discussing his investigation into the alleged misconduct. Notably, neither party objected to the admission or consideration of the reports below, and the court discusses the information in the reports in assessing both the claim of juror misconduct and response thereto. Accordingly, to the extent the parties' discussion of such evidence on appeal could be construed as a challenge to its admissibility, we conclude any claim of error regarding the trial court's improper use of such evidence is forfeited. (See Evid. Code § 353, subd. (a).)

unclear when that statement was made, either predeliberation or during deliberation." (Italics added.) Assuming, as the trial court did, arguendo, that Juror No. 1 made the comment that defendant was "stupid," we further agree with the trial court that, if such a statement was made prior to deliberations, it was in violation of the court's order that no juror should express any opinion on any subject connected with the trial until the matter was finally submitted to the jury and, thus, misconduct. (See *People v. Sandoval* (2015) 62 Cal.4th 394, 437 [comments violating trial court's instruction not to discuss case before deliberations constitute misconduct]; see also § 1122].)

However, after conducting an independent review of the record, based upon the nature of the alleged misconduct, we conclude the presumption of prejudice has been rebutted because there is no *substantial likelihood* that Juror No. 1, or any other juror, was actually biased against defendant. (See *In re Boyette*, *supra*, 56 Cal.4th at p. 890.) Accordingly, even if the trial court erred in considering the strength of the evidence inculpating defendant in weighing whether the presumption of prejudice was rebutted, the alleged juror misconduct does not require reversal. (See *In re Carpenter* (1995) 9 Cal.4th 634, 654 [noting "the test for determining whether juror misconduct likely resulted in actual bias is 'different from, and indeed less tolerant than,' normal harmless error analysis, for if it appears substantially likely that a juror is actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict"].)

In so concluding, we disagree with defendant's contention the alleged statement by Juror No. 1 in which she referred to defendant as "stupid," in and of itself, evinced a substantial likelihood that Juror No. 1 was "actually biased" against defendant. "What constitutes 'actual bias' of a juror varies according to the circumstances of the case." (*People v. Nesler*, *supra*, 16 Cal.4th at p. 580.) "[A]ctual bias supporting an attack on the verdict is similar to actual bias warranting a juror's disqualification." (*Id*. at p. 581.) "Either party may challenge an individual juror for 'an actual bias.' (Code Civ. Proc.,

§ 227, subd. (d).) 'Actual bias' in this context is defined as 'the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of the any party.'" (*People v. Nesler*, at p. 580.)

Here, no evidence was given as to when the alleged remark was made during trial or in what context. And we cannot conclude this single stray remark establishes Juror No. 1 prejudged the case or was predisposed to convict defendant regardless of the evidence presented. Rather, the alleged statement in and of itself does not establish Juror No. 1 was actually biased, nor was it a clear opinion of guilt before all of the evidence was presented. It would be sheer speculation for us to conclude the alleged statement established a substantial likelihood that Juror No. 1 was actually biased against defendant. There was also no evidence any other juror was influenced by the alleged statement. On this record, we conclude the presumption of prejudice was rebutted under the circumstances; that is, there is no *substantial likelihood* that one or more jurors were actually biased against defendant. (See *People v. Sandoval*, *supra*, 62 Cal.4th at p. 437 [presumption of prejudice was rebutted where alternate juror's predeliberation statement, expressing disbelief jury appeared split, was brief and isolated, only heard by one other juror, and was not repeated]; see generally *People v. Avila* (2006) 38 Cal.4th 491, 605 [assuming juror made statements "disparaging defense counsel, the trial court, and the criminal justice system, in violation of the court's admonition not to discuss any subject connected with the trial," whether statements were made "was not a material issue in the case" because they "had no bearing on the matter pending before the jury, that is defendant's guilt or innocence"]; *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 73 [juror's statement during deliberations that "'[w]hen the prosecution rested, she didn't have a case,'" was subject to interpretation; it was not an "'unadorned statement'" that juror had conclusively prejudged the case or that established he had ignored further evidence, argument, instructions, or the views of other jurors].)

*People v. Weatherton* (2014) 59 Cal.4th 589, on which defendant relies, is distinguishable. In *Weatherton*, a juror repeatedly discussed the case with fellow jurors prior to deliberations, conveying to them his belief that the defendant was guilty, and advocating for a verdict of guilt long before the prosecution had finished its presentation of evidence and the defense had an opportunity to call that evidence into question. (*Id*. at pp. 596–600.) As early as the first day of trial, the juror indicated to other jurors that "'there was no denying'" a prosecution witness's testimony, and that he believed her testimony was dispositive on guilt. (*Id*. at pp. 596, 599–600.) Both before and during deliberations, the juror expressed the view that the defendant deserved the death penalty, further suggesting he had made up his mind regarding the defendant's guilt. (*Id*. at pp. 593, 599–600.) "Given the nature, scope, and frequency" of the juror's misconduct, the *Weatherton* court concluded the People had not rebutted the presumption of prejudice and reversal was required. (*Id*. at p. 600.) In so holding, the court noted "'we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard. [Citation.]'" (*Ibid*.)

The alleged misconduct here is distinguishable from the substantial evidence of rampant misconduct present in *Weatherton*. The alleged misconduct in this case was neither prolonged nor repeated. As discussed, there is no evidence as to the context in which the alleged single stray remark by Juror No. 1 was made. And the statement, on its own, does not establish Juror No. 1 prejudged the case or that any other jurors evinced actual bias against defendant. Accordingly, *Weatherton* is inapposite. (See *People v. Merriman* (2014) 60 Cal.4th 1, 101 [juror's statement to deputy predicting death would be imposed while case was pending did not show substantial likelihood any juror was actually biased against defendant; concluding "the evidence of prejudgment in the present

46.

matter is far different from, and significantly less than, the circumstances that required reversal of the judgment for juror misconduct in *People v. Weatherton*"].)

Defendant further contends it was misconduct for Juror No. 1 to reveal her relationship to Perez to other jurors. First, we note, even if we were to assume Juror No. 1 did in fact tell the other jurors about the nature of her relationship to Perez, there is no evidence in the record as to when this occurred—before deliberations, during deliberations, or after deliberations. Accordingly, there is no evidence Juror No. 1 was trying to influence the other jurors' opinions about any issue in the case "or that the information was of the kind that was likely to exert such an influence." (*In re Bolden* (2009) 46 Cal.4th 216, 228.) Thus, we cannot conclude Juror No. 1's alleged disclosure of her relationship to Perez was prejudicial juror misconduct, nor did it establish Juror No. 1 was biased against defendant. (See *ibid.* [juror's disclosure to fellow juror regarding relationship to defendant's roommate was not prejudicial misconduct].)

And we defer to the trial court's factual finding that Juror No. 1 could be fair and impartial despite her relationship to Perez, which we conclude is supported by substantial evidence. Juror No. 1 explained she had no relationship with Perez; she had not seen him in a year and a half and had probably only seen him once before that; and she repeatedly asserted, unequivocally, that she could fairly and impartially serve as a juror notwithstanding her relationship with her sister and connection to Perez. (Cf. *People v. Romero* (2017) 14 Cal.App.5th 774, 781–782 [court erred in allowing juror to remain on panel where juror had been victim's teacher three years prior, "apparently had frequent personal interaction with the victim," "admitted a favorable impression of the victim," and juror stated she did not "think" her favorable relationship with victim would affect how she perceived evidence and participated in deliberations].) Accordingly, we accept the trial court's credibility determination regarding Juror No. 1's assertion she believed she could be fair and impartial. (See generally *People v. Zaragoza* (2016) 1 Cal.5th 21, 59 ["The trial court, which was able to observe the juror's tone and demeanor, conducted

47.

an inquiry adequate to determine that Juror No. 8 could be impartial and would be unaffected by the coincidence that the victim's brother, who was not a witness in the case, worked at the juror's place of employment"].)  And we conclude the juror's responses to the court's inquiry into her relationship to Perez and her affirmation that the relationship would not affect the juror's deliberations, further rebuts any potential issue of juror bias or misconduct.

For all these reasons, we reject defendant's contention there was prejudicial juror misconduct and that the court erred in denying defendant's motion for new trial on that basis.

### III.    Judicial Notice of Preliminary Hearing Testimony

Defendant next argues the trial court prejudicially erred in taking judicial notice of an excerpt of Christian's testimony from the preliminary hearing.  We reject defendant's contention.

#### A.    Relevant Factual Background

At trial, the following exchange took place with defendant's brother, Christian, regarding whether he saw any of the four men from the liquor store with a gun at Corcoran and Lassen:

"Q.  Do you remember telling the Court that you didn't see any of the men at Corcoran and Lassen, the four men from the liquor store, you didn't see any of them with a gun?

"A.  I don't remember.  I don't remember.

"Q.  Did you see any of the men at Corcoran and Lassen from the liquor store with any kind of a weapon?

"A.  Yes.

"Q.  Okay.  But you testified that you did not?

"A.  Well, I don't remember, I don't know.

"[PROSECUTOR]:  Okay.  I'm going to ask to approach the witness.

48.

"THE COURT:  Go ahead.

"[DEFENSE COUNSEL]:  May I—

"[PROSECUTOR]:  For the record, I'm looking at page 31 of the preliminary hearing transcript.

"Q.  Now I'm going to ask you to read this silently while I read this aloud to you.

"My question was 'Did you see anyone at Corcoran and Lassen with a gun?'  Your response was 'no.'

"Was that your testimony?

"A.  Yes, it says on the paper.  I don't remember.  But on the paper it says, yes, I said 'no.'"

Later that day, the prosecutor asked the court to take judicial notice of the question and answer from Christian's preliminary hearing testimony:

"[PROSECUTOR]:  I have never asked this specifically, and if I'm not allowed to do this then please tell me no.

"But there was a question from the preliminary hearing that was inconsistent—the answer was inconsistent with something he said in court. Would the Court allow me just to take judicial notice of one question and one answer from Christian Martinez's—as a prior testimony?

"THE COURT:  What was the question and what was the answer?

"[PROSECUTOR]:  I said 'Did you see anyone at Corcoran and Lassen with a gun?' And he answered 'no.'

"I believe that he gave a lot of I don't knows or there might have been a gun, so I just think it would clarify, and it's just that one question and answer.

"THE COURT:  Are you saying that he—he testified today that somebody had a gun?

"[PROSECUTOR]:  He was kind of all over the place.

"THE COURT:  No, I understand.  But—

"[PROSECUTOR]:  I thought he had said at various times that he thought they had a gun.

49.

"THE COURT: Well, thinking they have a gun and seeing a gun are different.

"[PROSECUTOR]: Right. This answer is so unequivocal, it seems to me that it would not take up much of the Court's time, and it would resolve the issue—

"THE COURT: Well, it doesn't matter—well I understand that it's not going to take time. I'm just trying to determine if it's an inconsistent statement.

"[PROSECUTOR]: Would the Court like me to direct the Court to the passage of the prelim or give the Court my transcript?

"THE COURT: I would like to see it. Have you shown it to Mr.—

"[DEFENSE COUNSEL]: I have seen it, your Honor. I'm familiar with what—

"THE COURT: Okay. Let me take a look at it.

"And you are saying that he testified to that?

"[PROSECUTOR]: That is from the preliminary hearing transcript in this case. And what he said in this trial, I believe, was—was a lot of I don't know and speculation about whether they did or did not have a gun."

The court stated it needed "to review the transcripts of his testimony to see if it's inconsistent." Defense counsel objected to the prosecutor reading into the record the referenced passage of the transcript of the preliminary hearing.

The court overruled the objection and held, "[i]t seems to be proper impeachment." Accordingly, the court permitted the prosecutor to read the following passage from Christian's preliminary hearing testimony into the record:

"'Q. But at Corcoran and Lassen did you see the gun?'

"Christian Martinez: [¶] 'A. No.'

"'Q. Okay. Because none of the men had a gun there?'

"'A. (Nods affirmatively.)'

"'Q. Is that correct?' [¶] … [¶]

50.

"'Q. I'm asking him did anyone at the Corcoran and Lassen have a gun?'

"The Court then says:

"'Did you see? He doesn't know whether they actually had one or not.'

"And then [the prosecutor] said:

"'Q. Did you see anyone at Corcoran and Lassen with a gun?'

"Christian Martinez: [¶] 'A. No.'"

In closing argument, the prosecutor stated, in part, "We heard that even as far back as the preliminary hearing, Christian Martinez came to court and said there was no gun, there was no gun at Corcoran and Lassen. We heard that the Court took judicial notice of that."

## B.    Standard of Review and Applicable Law

"'Judicial notice is the recognition and acceptance by the court, for use by the trier of fact or by the court, of the existence of a matter of law or fact that is relevant to an issue in the action without requiring formal proof of the matter.'" (*Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882.) Evidence Code section 452, subdivision (d) provides, in relevant part, that judicial notice may be taken of the records of "any court of this state."

## C.    Analysis

Defendant challenges the court's decision to take judicial notice of Christian's referenced testimony from the preliminary hearing, asserting "by taking judicial notice of a disputed fact of consequence to the action, the court directed a verdict against [defendant] on a significant element, violating his rights to due process, fundamental fairness, a jury trial and the presumption of innocence." He contends the prosecutor's reliance on this "judicially-endorsed fact" to argue the jury should reject defendant's plea of self-defense lightened the prosecution's burden of proof. We disagree.

51.

Here, the court's action of taking judicial notice of Christian's prior inconsistent statement from his preliminary hearing testimony to establish its *existence* rather than its *truth* was proper,[5] and doing so did not establish the truth of Christian's prior statement. (See *People v. Jennings* (2010) 50 Cal.4th 616, 684, fn. 34 [noting, even if court "could take judicial notice of the existence, content, and authenticity of … secondary materials, doing so would not establish the *truth* of critical factual matters asserted therein"]; accord, *People v. Castillo* (2010) 49 Cal.4th 145, 157 ["Although we could take judicial notice of the existence, content, and authenticity of such letters, doing so would not establish the *truth* of critical factual matters asserted in those documents" (fn. omitted)]; see also *Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063–1064 ["'[T]he taking of judicial notice of the official acts of a governmental entity does not in and of itself require acceptance of the truth of factual matters which might be deduced therefrom, since in many instances what is being noticed, and thereby established, is no more than the existence of such acts and not, without supporting evidence, what might factually be associated with or flow therefrom'"], overruled on other grounds by *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1262.) Notably, the prosecutor did not ask the court to take judicial notice of the referenced exchange from the preliminary hearing transcript for the purpose of establishing the truth of the statements made therein. And the court did not state, nor was the jury instructed, that the court's decision to take judicial notice of such testimony established the truth of the disputed factual matter discussed therein.

And, contrary to defendant's contention, the prosecutor did not assert the disputed fact was resolved by the court's taking of judicial notice of Christian's prior inconsistent

---

[5]See *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 766–767 ["A witness's out-of-court statement 'is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 770'"]; accord, Evid. Code, § 1235; see also Evid. Code, § 452, subd. (d) [court may take judicial notice of a court record].)

testimony. Indeed, when questioning defendant on cross-examination, the prosecutor noted Christian testified previously that he did not see anyone at Corcoran and Lassen with a gun, but then Christian testified in court that he saw someone with a chrome gun before the shooting. Accordingly, the prosecutor did not insinuate or tell the jury this disputed fact was resolved by the court's taking of judicial notice of the preliminary hearing testimony but rather highlighted the inconsistency in Christian's statements. Thus, we cannot conclude the court's taking judicial notice of the existence of such testimony amounted to it resolving a disputed fact and lightening the prosecution's burden of proof. Rather, nothing in the record establishes the court erred in taking judicial notice of this testimony.

## IV.    Denial of Motion for Continuance

Defendant next asserts the court prejudicially erred in refusing to grant him a continuance to secure the attendance of the doctor who evaluated him during the competency proceedings before trial. We disagree.

### A.    Relevant Procedural Background

On August 8, 2018, defense counsel filed a motion to continue the trial to permit the defense to call Dr. Luis H. Velosa, who was out of the country until September 17, 2018. In an attached declaration, defense counsel averred that Dr. Velosa was "a necessary and material witness for potential defenses as well as providing mitigating facts should the Defendant ultimately be found guilty." He stated he served a subpoena on Dr. Velosa to testify at trial on August 6, 2018, but Dr. Velosa's office informed him Dr. Velosa was out of the country until September 17, 2018. He attached a letter from Dr. Velosa's office clerk stating Dr. Velosa "will not be available for court appointed evaluations from June 15, 2018 to September 17, 2018. He will be out of the Country during this time."

The court held a hearing on the motion at which the prosecutor orally opposed the motion.[6] The prosecutor argued Dr. Velosa was not relevant or material to the matter as he "is an expert who only evaluated the defendant for competency, and he found the defendant competent." The prosecutor asserted the motion seemed "to be a tactic to try to continue the case."

Defense counsel responded that his office subpoenaed Dr. Velosa and believed "his testimony would be relevant in the context that [Dr. Velosa] interviewed [defendant] as part of a competency evaluation … [and] while he did find [defendant] competent to stand trial, he found … [defendant] has developmental issues and other issued [*sic*] such as ADHD." Defense counsel stated he sought to call Dr. Velosa as a witness regarding defendant's "ability to form the mental—" The court then asked if defense counsel had spoken to the doctor. Defense counsel responded he had Dr. Velosa's report from the mental competency hearing and his "statement" and had tried to subpoena him, but the subpoena could not be delivered.

The court denied the motion to continue, concluding there was "an exceedingly weak showing" of good cause that was "[c]ertainly not sufficient to warrant continuing the trial." The court stated, "The analysis [Dr. Velosa] was doing was directed toward trial competence, which is a very narrow and specific determination. His charge from this Court was not to do a full blown psychiatric workup on the defendant, and there is no evidence that he did such a workup." The court further noted there was no effort to subpoena Dr. Velosa until August 6th, though the trial had been set for months.

After the court denied the motion, the parties confirmed they were ready to proceed with trial. Trial began the following Monday.

---

[6]The hearing was held on Friday, August 17, 2018 and defendant's jury trial began the following Monday, August 20, 2018.

## B. Standard of Review and Applicable Law

A continuance may only be granted for good cause, and trial courts have broad discretion to determine whether good cause exists. (§ 1050, subd. (e); *People v. Alexander* (2010) 49 Cal.4th 846, 934.) "When a continuance is sought to secure the attendance of a witness, the defendant must establish 'he had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven.'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037; accord, *People v. Wilson* (2005) 36 Cal.4th 309, 352.) "The court considers "'not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.'"" (*Jenkins*, at p. 1037.)

We review an order denying a motion to continue for an abuse of discretion. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.) The party challenging a ruling on a continuance bears the burden of establishing an abuse of that discretion. (*People v. Beames* (2007) 40 Cal.4th 907, 920; *People v. Strozier* (1993) 20 Cal.App.4th 55, 60; *People v. Jeffers* (1987) 188 Cal.App.3d 840, 850.) "Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered." (*People v. Beames*, *supra*, at p. 920.) In determining whether the denial was so arbitrary as to violate due process, we look to the circumstances of each case, particularly the reasons presented to the court at the time the request was denied. (*People v. Courts* (1985) 37 Cal.3d 784, 791; *Jeffers*, *supra*, at p. 850.)

## C. Analysis

Defendant asserts all of the circumstances were present to establish good cause to procure the presence of Dr. Velosa. He asserts defense counsel reasonably subpoenaed Dr. Velosa 17 days before trial, and the court erred in focusing on when the subpoena was served. Defendant contends, regardless, Dr. Velosa was unavailable and "his

unavailability was not counsel's fault." He contends Dr. Velosa's testimony regarding defendant's "mental condition" would "aid the jury in deciding whether [defendant] actually formed the mental state(s) required to commit the charged crimes." He also argues such testimony was "important to sentencing" because the sentencing court was entitled to consider the ""mitigating qualities of youth.""

We cannot conclude the trial court abused its broad discretion in denying defendant's motion for a continuance. Here, defendant failed to establish the materiality of Dr. Velosa's testimony or provide an offer of proof as to what exculpatory testimony he might offer. Put differently, the defense did not explain what facts Dr. Velosa would testify to that were "necessary" and "material" to the defense. Rather, counsel simply made conclusory statements that the anticipated testimony was "material" and "necessary." But, as the court noted, Dr. Velosa conducted a limited evaluation of defendant's competence to stand trial. The critical focus of a competency inquiry is upon defendant's *present* capacity to understand the nature of the criminal proceedings and rationally assist counsel in the conduct of a defense, not his past mental state associated with the commission of the offense. (See *People v. Hayes* (1999) 21 Cal.4th 1211, 1281.) While in his brief defendant states Dr. Velosa's report "provides insight into what he would have testified to at trial," as discussed, Dr. Velosa's report related to defendant's competency to stand trial. Defendant's contention that "Dr. Velosa would have testified as to how [defendant]'s diagnosed conditions may have affected his mental state" on the date of the offense is speculative and not grounded in any basis in the record. (See *In re Ernesto H.* (2004) 125 Cal.App.4th 298, 316 ["A continuance may properly be denied when the request is based on allegedly new evidence of speculative value"].) Rather, on the record before us, we cannot conclude defendant has met his burden of establishing the court abused its discretion in concluding Dr. Velosa's anticipated testimony would be of limited apparent utility and, thus, defendant did not establish good cause for a continuance. (See *People v. Reed* (2018) 4 Cal.5th 989, 1005 [court did not abuse its

discretion in denying request for continuance to procure witness's attendance where continuance would have been of "limited apparent utility"]; accord, *People v. Riggs* (2008) 44 Cal.4th 248, 297 [court did not abuse its discretion in denying request for continuance to secure attendance of three witnesses whose "testimony was immaterial, as it was speculative at best"]; see also *People v. Jenkins*, *supra*, 22 Cal.4th at p. 1038 ["court was within its discretion in refusing to grant a continuance, because defendant had not demonstrated that a continuance would be useful in producing specific relevant mitigating evidence within a reasonable time"]; *People v. Beeler* (1995) 9 Cal.4th 953, 1003–1004 [continuance properly denied when defendant's request was based upon new evidence of speculative value], abrogated on another ground as stated in *People v. Edwards* (2013) 57 Cal.4th 658, 704–705.) And, for the same reasons, we cannot conclude defendant has established a reasonable probability he would have obtained a more favorable verdict had the continuance been granted. (*People v. Panah* (2005) 35 Cal.4th 395, 423 ["'In the absence of a showing of an abuse of discretion and prejudice to the defendant, a denial of a motion for a continuance does not require reversal of a conviction'"].)

In addition, though defendant argues Dr. Velosa was available to testify in September, the evidence before the court did not establish a finite date as to Dr. Velosa's expected availability to appear at defendant's trial. Rather, defense counsel merely presented the court with information regarding when Dr. Velosa would return to the country, rather than a specific date when Dr. Velosa would be available to testify. Defense counsel also did not represent he had spoken to Dr. Velosa.

Defendant's reliance on *People v. Shane* (2004) 115 Cal.App.4th 196 is misplaced. In *Shane*, the court held the trial court did not abuse its discretion in granting the prosecution a continuance after they attempted to serve a *key* witness—the arresting officer in a misdemeanor case alleging traffic violations, including driving under the influence of alcohol—four days before the initial trial date and learned he was

unavailable.  (*Id*. at pp. 203–205.)  In so holding, the *Shane* court rejected the defendant's proposed rule that the prosecution should be required to serve a subpoena on a peace officer who is a material witness as soon as the trial date is set to show good cause for a continuance based on the officer's unavailability.  (*Id*. at p. 204.)  The court held, "because a finding of good cause is by its nature fact intensive, it would be entirely arbitrary for us to require as a matter of law that a witness's availability be determined no later than a fixed number of days before the trial date for good cause to be shown." (*Id*. at p. 205.)

Here, the court concluded defendant had not established good cause for a continuance based primarily on an insufficient showing by defendant of the materiality of Dr. Velosa's testimony, which was not at issue in *Shane* where the missing witness was a key witness—the arresting officer in a case in which the defendant was charged, in part, with driving under the influence of alcohol.  As discussed, we cannot conclude the court abused its discretion in denying the requested continuance on that basis.  Furthermore, the consideration of whether due diligence was exercised is fact-specific.  This was a murder occurring in August 2016 and had been pending for approximately two years. There were multiple witnesses and, aside from this request to procure Dr. Velosa's attendance, the parties otherwise announced they were ready to proceed with trial.  Given the particular circumstances of this case, we cannot conclude the court erred in concluding substantial justice would not be served by granting a continuance.  (See *People v. Beames*, *supra*, 40 Cal.4th at pp. 920–921 ["an order denying a continuance is seldom successfully attacked"; "discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered"].)

V.     **Admission of Rap Video into Evidence**

Defendant next argues the court abused its discretion in admitting at trial a video recording of him rapping.

58.

## A.      Relevant Factual Background

Gang expert Officer Segura testified rap music is part of gang culture.  He explained, "within the gang subculture, depending what gang it is, there is [*sic*] Hispanic gangs, black gangs, there's numerous types of gangs, along with the clothing and colors and symbols they use to represent the gang, there is also music, which each gang uses to either challenge rival gang members or to tell even the general public personal war stories or just ideas and philosophy of the gang life."

Officer Segura testified he found on the cellular phone recovered from the Chevy Malibu numerous rap videos and audio recordings of defendant rapping.  Segura explained, "there's a lot of content in each rap or song.  The content of the songs is 'staying strapped' for lack of better … words, he's … always armed.  He talks about disrespecting chaps, which is a slang term to disrespect the Norteno gang members. He talks about some of his homies or comrades, friends who are also part of the gang.  And he also talks a little bit about some experiences that he may or may not have experienced in his life in those songs."

The prosecution introduced a recording from the cellular phone seized during the investigation.  Defense counsel objected to the recording "as to foundation and also cumulative and undue consumption of time."  The prosecutor advised the court the recording was a little over a minute long and the court reviewed a transcript of the recording.  The court asked the prosecutor if he knew when it was "actually recorded in relation to the events in this case."  The prosecutor responded "there is context in the recording where he talks about an incident that … law enforcement did investigate." Officer Segura then discussed an incident occurring within months of the charged incident during which defendant's residence was vandalized; one of the windows was shot with a BB or pellet gun.

The court then asked the prosecutor about the relevance of the recording.  The prosecutor responded, "[H]e talks about shooting at rival gang members, he shows knowledge of the primary activities of the gang.  I think this would also go to malice

59.

aforethought, willful, deliberate, and premeditated. That he's thought about these crimes before he committed them, he's specifically calling out the same people that he killed in advance." The court then asked how the prosecutor knew Sergio Cabral was involved in the vandalism. The prosecutor responded:

> "No, not that, that he's calling out rival gang members. We have heard that Mr. Cabral was AVL, that's the rival as we heard of TLS. So this is a message to not just Sergio Cabral, but all the members of the AVL, I think it's showing his malice well before he even shot.

> "And I could go on about the other things that this also proves. It goes to every aspect of the gang enhancement. I have to prove knowledge and that these are the primary activities of the gang—"

The court noted such evidence appeared to "be more relevant to that area: The gang, culture of the gang, lifestyle of the gang, mentality." Defense counsel argued, while such evidence "may be relevant, it's unduly prejudicial given the context." Defense counsel asked whether there were several other recordings. The prosecutor stated there were three in total; the shortest was a minute long and the longest was three minutes.

The court reviewed the recordings and held it would allow the prosecutor to play the first recording. The court declined to permit two more recordings reasoning "[u]nder [Evidence Code section] 352 it's going to be cumulative, they seem to be the same nature, and you can refer to them that there are others that are similar to the one that [the prosecutor was] going to be playing." The prosecutor specified one of the three recordings he wanted to use. The court directed the prosecutor to lay a proper foundation and the court would allow it.

Accordingly, the prosecution introduced a video recording in which defendant can be heard rapping, but he does not appear visually; rather, the screen is black or dark during the recording. The People also presented the jury with a transcript of the lyrics. The court advised the jury the transcript was not evidence but was to aid them in helping understand what was being played.

60.

Officer Segura explained the exhibit "is an instrumental song playing in the background, and there are some lyrics to the line of a subject by the name … or moniker of Grumpy, he starts rapping about events that occurred in his life along with other contents in regard to the gang lifestyle and killing people, that kind of stuff." He stated Grumpy is defendant's moniker or nickname. Segura testified the word "chap" in the lyrics is "a derogatory term in the gang subculture referred to by the rivals of the Norteno criminal street gang." He explained the lyric "'I'm gonna aim right, put some motherfucker six feet deep'" meant defendant "is going to have somebody buried six feet underground." And "'ready to check a fuckin' chap on the low key'" meant to silently or secretively put someone who disrespects him "in check." The phrase "'Smashing on chaps'" in the lyrics referred to "assaulting or killing Nortenos." And the word "clack" in the phrase "'Ready to clack … a fuckin' chap'" is describing the sound of a gunshot. There was also a lyric, "'we're gonna kill a chap,'" that Officer Segura testified meant "[h]e's going to kill a Norteno."

Defendant admitted it was his voice in the recording and, when asked if he talked about killing a chap in the recordings, defendant testified, "It's just little kid stuff, I was 16 years old."

In closing argument, the prosecutor referenced the rap lyrics in discussing deliberation and intent to kill:

> "… And what's … important to remember in this situation is that this does not appear to be a decision that was made quickly at all. We heard from the defendant's brother Christian that the defendant was insulted, he was disrespected, there was somewhere between 15 and 30 minutes, a 'cool off' period where the defendant did, in fact, 'cool off,' where he calmed down, where he left the … liquor store, went to the gas station, according to the defendant tried to pick up a friend and then they just start driving around randomly, just cruising for no discernible reason.

> "So, again, intent to kill, the same thing. Deliberate, did he weigh the choices knowing the consequences? We know he was armed, we know that he thought about killing chaps in the past. *We heard this music where he starts talking about killing a chap, and we heard this was part of—*

61.

*something that was on his mind that he had thought about this type of act before he even chose to—to commit a murder.* We note that he had the gun, that it was loaded ready to go, that he's driving around, he's looking for a person with a gun, all of that shows that he weighed the choices, even if it was a terrible choice, knowing the consequences.

"And then finally did he decide to kill before he acted? And, again, we're told that a cold, calculated decision to kill can be reached quickly. This is a cold, calculated decision. I would submit to you that when he had that gun and he started looking for these people, he had already premeditated, he had already made his decision.

"But if you don't believe that, when he first pulled the gun out and pulled the trigger, think about that, you are taking out a gun, and you are going to end a human's life, and then he decided to shoot five more times. Every single click of the revolver showed premeditation, showed that he decided to kill before he acted. When he aimed for the head and pulled the trigger. So that's one theory of first degree murder." (Italics added.)

The prosecutor also mentioned the rap music when discussing evidence defendant was an active participant in a gang, and he argued, in "that rap music, [defendant] is referencing all the crimes that the gang members commit. He is talking about killing chaps and—so that's been proven."

The court admonished the jury it could "consider evidence of gang activity only for the … limited purpose of deciding whether:

"The defendant acted with the intent, purpose, and knowledge that are required to prove the gang related crimes and enhancements and special allegations charged; or the defendant had a motive to commit the crimes charged; or the defendant actually believed in the need to defend himself; or the defendant acted in the heat of passion.

"You may also consider this evidence when you evaluate the credibility or believability of a witness, and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.

"You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crimes."

62.

## B.    Standard of Review and Applicable Law

Evidence is admissible only if it is relevant.  (Evid. Code, § 350.)  All relevant evidence is admissible except as otherwise provided by a statutory or constitutional exclusionary rule.  (See Cal. Const., art. I, § 28, subd. (f)(2); Evid. Code, § 351.)  Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  The general test of relevance "'is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.'"  (*People v. Bivert* (2011) 52 Cal.4th 96, 116–117.)

A court may exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  A trial court has broad discretion in determining whether evidence is relevant and whether Evidence Code section 352 precludes its admission.  (*People v. Mills* (2010) 48 Cal.4th 158, 195; *People v. Williams* (2008) 43 Cal.4th 584, 634.)  We review for an abuse of discretion a trial court's rulings on the admissibility of evidence, including those turning on the relevance or probative value of the evidence in question.  (See *People v. Lee* (2011) 51 Cal.4th 620, 643; *People v. Hamilton* (2009) 45 Cal.4th 863, 929–930.)

"[S]tate law error in admitting evidence is subject to the traditional *Watson* [*People v. Watson* (1956) 46 Cal.2d 818] test:  The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error."  (*People v. Partida* (2005) 37 Cal.4th 428, 439.)  Federal due process is offended only if admission of the irrelevant evidence renders the trial fundamentally unfair.  (*Ibid.*)

## C.    Assembly Bill No. 2799

On September 30, 2022, the Governor approved Assembly Bill No. 2799 (2021–2022 Reg. Sess.) (Assembly Bill 2799) and filed it with the Secretary of State.  Assembly

Bill 2799 expresses the Legislature's intent to "provide a framework by which courts can ensure that the use of an accused person's creative expression will not be used to introduce stereotypes or activate bias against the defendant, nor as character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice." (Stats. 2022, ch. 973, § 1, subd. (b).)

To that end, effective January 1, 2023, Assembly Bill 2799 adds section 352.2 to the Evidence Code, which requires:

> "(a) In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings."

Evidence Code section 352.2, subdivision (d) provides the admissibility of a form of creative expression shall be heard in limine and determined by the court, outside the presence and hearing of the jury, pursuant to Evidence Code section 402, and the court "shall state on the record its ruling and its reasons therefor." (Evid. Code, § 352.2, subd. (d).)

### D.    Analysis

Defendant argues the trial court should have excluded the video recording of him rapping pursuant to Evidence Code section 352 as more prejudicial than probative. He asserts gang evidence poses a "high risk of serious prejudice." He likens his case to *People v. Coneal* (2019) 41 Cal.App.5th 951 (*Coneal*), in which the appellate court

concluded the admission of rap videos was an abuse of discretion, but the error was harmless. He argues, as in *Coneal*, "this case admitted a plethora of gang evidence" (boldface omitted) and, when defendant testified, he admitted he was a member of TLS on the date of the offense. Thus, there was "overwhelming evidence concerning [defendant's] participation in the TLS gang" and "[t]he rap lyrics added nothing more of evidentiary value to the prosecutions' [*sic*] case." Defendant also argues the court should have excluded evidence about the purported meaning of the rap lyrics because the lyrics should not have been construed literally. He asserts the prosecutor used the lyrics as evidence of a pattern of gang activity and defendant's intent to kill, citing the prosecutor's closing argument. In arguing the error in admitting the rap lyrics was prejudicial, defendant acknowledges some gang evidence was relevant and admissible in light of the charges. But, he contends, "the rap lyrics went beyond the bounds of the other gang evidence and was [*sic*] extremely prejudicial" in that they "were akin to evidence of a confession." He argues the lyrics themselves and the manner in which the prosecutor used them to argue they were "an accurate and reliable manifestation" of defendant's thoughts, knowledge, and intent, were "extremely prejudicial" because there was little other evidence of defendant's intent to kill. He argues the admission of the rap lyrics in this case violated his due process rights "because its only true relevance was to show that he acted in conformity with bad character." The People respond the rap lyrics at issue "were highly probative" of defendant's mental state and to prove defendant's involvement with TLS and his knowledge of TLS's primary activities. They assert the court here limited the introduction of such evidence, excluding two of the three videos offered, and no screenshots from the videos were introduced, as in *Coneal*. They further respond, defense counsel never objected to the prosecutor's argument regarding the rap lyrics, so defendant's challenge to the related argument is forfeited. They further argue the lyrics were probative of their literal truth, so an objection was not warranted. Finally, they assert the rap lyrics were not prejudicial in light of the other evidence inculpating

65.

defendant, including defendant's confession to police when he was interviewed. In supplemental briefing, defendant asserts the rap lyrics were also inadmissible under newly enacted Evidence Code section 352.2. The People disagree that Assembly Bill 2799 should operate retroactively and assert, regardless, any error in the admission of the rap lyrics was harmless. We agree with the People that any error in the admission of the rap lyrics was harmless.

In *Coneal*, the prosecution introduced multiple rap videos, a rap audio recording, and multiple screenshots capturing images from the videos at trial. (*Coneal*, *supra*, 41 Cal.App.5th at pp. 960–963, 966.) On appeal, the defendant argued the court erred in admitting five of the videos because they were cumulative and more prejudicial than probative. (*Id.* at pp. 965–966.) The *Coneal* court held the admission of the rap videos was error because the probative value of the videos was minimal, either because they were cumulative of other, less prejudicial evidence, or because their probative value depended on construing the lyrics as literal statements of fact or intent without a persuasive basis to do so. (*Id.* at pp. 953, 966–972.) And, the prejudicial nature of the violent, inflammatory lyrics substantially outweighed their minimal probative value. (*Id.* at pp. 953–954, 970–972.) The court explained "the rap videos paint a picture of appellant and his fellow gang members as eagerly and ruthlessly seeking out and engaging in violence, with no empathy for their victims. While it may be that this picture is accurate, it poses a significant danger that the jury will use it as evidence of appellant's violent character and criminal propensity in violation of Evidence Code section 1101, subdivision (a)." (*Id.* at pp. 970–971, fn. omitted.) The *Coneal* court noted it did "not mean to suggest that lyrics are never probative of their literal truth. For example, where lyrics are written within a reasonable period of time before or after the charged crime and bear a sufficient level of similarity to the charged crime, their probative value as a statement of fact is increased." (*Id.* at p. 969.) The *Coneal* court cautioned that "[t]rial courts should carefully consider whether the potential for prejudice posed by [rap songs

that promote and glorify violence] outweighs their probative value. In particular, where the rap lyrics are cumulative of other evidence … or where the probative value rests on construing the lyrics literally without a persuasive basis to do so, the probative value will often be 'substantially outweighed by [the] prejudicial effect.'" (41 Cal.App.5th at pp. 971–972.) However, the court concluded the error in the admission of such evidence was harmless considering the other evidence of the defendant's guilt. (*Id.* at pp. 954, 972–973.)

Here, the court limited the introduction of the rap recordings to one recording approximately three minutes long; this is in contrast to *Coneal*, in which the prosecution introduced five videos, an audio recording, and multiple screenshots from the videos. We further acknowledge, to the extent the court admitted the rap recording to evidence gang culture and defendant's gang association, such evidence was relevant; but there was also other probative evidence on these topics. Indeed, defendant himself testified he was a gang member at the time of the offense. Additionally, by defendant's own testimony, the confrontation that escalated to him shooting Cabral involved Cabral's group throwing rival gang signs and using slurs. And there was other testimony and evidence regarding defendant's gang affiliation: pictures of his gang-related tattoos, a photograph of him making a gang hand sign, a video of him burning a red bandana—the color representing the rival Norteño gang—testimony he had a blue bandana and a paper of the 13 Bonds on his person when he was arrested, and the testimony of other officers who had personal past interactions with defendant and other gang members, as well as evidence of gang culture from the prosecution's gang expert and other witnesses.

Nevertheless, we need not decide whether the court abused its discretion in admitting such evidence because, even if we were to assume, arguendo, the trial court erred in admitting this recording, we conclude the error was harmless under the standard

articulated in *People v. Watson*, *supra*, 46 Cal.2d at page 836.[7] Put differently, we cannot conclude it is reasonably probable defendant would have obtained a more favorable result if the recording had been excluded. (See *People v. Young* (2019) 7 Cal.5th 905, 931 ["'When evidence is erroneously admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would have occurred absent the error'"]; *People v. Powell* (2018) 5 Cal.5th 921, 951 [same].) And we cannot conclude the admission of the rap video amounted to a violation of defendant's due process rights, rendering the trial fundamentally unfair. (See *People v. Partida*, *supra*, 37 Cal.4th at p. 439 ["the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*"].)

In so concluding, we note the evidence in this case against defendant was strong. Defendant admitted to committing the shooting both after the offense and at trial. His theory at trial was he acted in self-defense. However, he admitted he did not tell the police in his interview following the incident that any member of Sergio Cabral's group was armed or that he was acting in self-defense. And, while he and Christian both testified at trial that one of the individuals in Cabral's group flashed a gun, as discussed, the prosecution presented previous testimony in which Christian denied any member of the victim's group displayed a gun at the intersection where the fatal shooting occurred. Additionally, there was other evidence of defendant's intent to kill, premeditation and deliberation,[8] and defendant's gang affiliation such that we cannot conclude admission of the rap video prejudiced defendant. The undisputed evidence established defendant fired multiple shots and the victim was hit with multiple bullets. One of the bullet entry

---

[7]Because we are assuming error, we need not address the parties' arguments regarding the retroactivity and application of Assembly Bill 2799 to this case.

[8]Additionally, premeditation and deliberation were not necessary to establishing first degree murder given that defendant could also be convicted of first degree murder under a theory of discharging a firearm from a motor vehicle. (See § 189, subd. (a).) Indeed, defendant himself admitted he discharged a firearm from a motor vehicle resulting in Cabral's death.

wounds was in Cabral's lower back, providing evidence he was shot while his back was turned. There was also evidence of a pause between two sets of shots and a lapse of time between the initial confrontation at the liquor store and the ultimate shooting. And, while the lyrics of the rap song reflected a general animosity toward rival gang members, it did not relate specific facts incriminating defendant in this shooting such that it was "akin to a confession" as defendant argues.

In light of the strong evidence incriminating defendant and discrediting his self-defense theory, we cannot conclude the admission of the rap recording prejudiced defendant. Rather, we conclude any potential error in its admission was harmless. (See *Coneal*, *supra*, 41 Cal.App.5th at pp. 972–973 [error in admitting five rap videos in violation of Evid. Code, § 352 was harmless where evidence incriminating defendant was strong]; *People v. Jasmin* (2008) 167 Cal.App.4th 98, 114 [any error in admitting rap lyrics focused on guns and violence was harmless in light of "overwhelming evidence presented at trial"].)

## VI. Jury Was Properly Instructed on Self-defense

Defendant next argues the court erred by failing to sua sponte instruct the jury it should consider defendant's youth in assessing his claim of self-defense. We disagree.

### A. Relevant Factual Background

The court instructed the jury on homicide and self-defense pursuant to CALCRIM Nos. 500 and 505. As to self-defense, CALCRIM No. 505 instructs the jury, in relevant part, "When deciding whether the defendant's belief was reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed."

The court also instructed the jury on imperfect self-defense in accordance with CALCRIM No. 571, including, in relevant part, "In evaluating the defendant's beliefs, consider all the circumstance [*sic*] as they were known and appeared to the defendant."

Additionally, the court instructed the jury on voluntary manslaughter pursuant to CALCRIM No. 570, which provides, in relevant part: "It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment. [¶] If enough time passed between provocation and the killing for a person of an average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis."

Defense counsel did not object to these instructions, request additional instructions, or ask for any modifications or amplifications to these instructions. Rather he stated he was "in agreement" with them, and the jury instructions the court gave to the jury were "proper." In closing argument, defense counsel asserted defendant was provoked, and he argued the jury should consider how a reasonable 16 year old in the situation would react:

> "And then would an average person or a reasonable person, excuse me, not average, would a person of average disposition act rashly without due deliberation? We are talking about a reasonable person. You also have to consider the fact, you know, a reasonable person in similar circumstances and situations. So a reasonable 16 year old in that situation given the stimulus that he was confronted with, was it reasonable for him to react in the way that he did? Not whether it was right or wrong, we are still talking about an unlawful killing, but based on these three factors are they met? That would serve to reduce the murder to a voluntary manslaughter."

## B.    Standard of Review

""""It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are

70.

necessary for the jury's understanding of the case."'" (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) A trial court has a duty to instruct sua sponte on particular defenses "'"'if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'"'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1052; accord, *People v. Salas* (2006) 37 Cal.4th 967, 982 [trial court has duty to instruct sua sponte on any affirmative defense "for which the record contains substantial evidence … unless the defense is inconsistent with the defendant's theory of the case"].)

"'"'[W]hen a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking *sua sponte* instructional duties. While a court may well have a duty to give a 'pinpoint' instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such 'pinpoint' instructions … must be given only upon request.'"'" (*People v. Anderson* (2011) 51 Cal.4th 989, 996–997.) This is because a trial court's obligation to give general instructions sua sponte does not extend to "pinpoint" instructions or optional paragraphs of instructions. (See *People v. Hughes* (2002) 27 Cal.4th 287, 361 ["Even if proper, … pinpoint instructions 'are not required to be given sua sponte'"]; *People v. Gutierrez* (2009) 45 Cal.4th 789, 824 [defendant is entitled to pinpoint instructions, upon request, only when appropriate; but such instructions "'are not required to be given sua sponte'"]; accord, *People v. Whalen* (2013) 56 Cal.4th 1, 81–82 ["'A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal'"], disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17; *People v. Lawley* (2002) 27 Cal.4th 102, 160–161 [court not required to modify standard instruction absent request by defendant].)

"'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'" (*People v. Landry* (2016) 2 Cal.5th 52, 99–100.) We may nevertheless review a forfeited claim of error if it affected a defendant's substantial rights. (§ 1259; *People v. Delgado* (2017) 2 Cal.5th 544, 572, fn. 15; accord, *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249 [failure to object to instruction waives claim of error "unless the claimed error affected the substantial rights of the defendant, i.e., resulted in a miscarriage of justice, making it reasonably probable the defendant would have obtained a more favorable result in the absence of error"].) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen*, *supra*, at p. 1249.)

We review claims of instructional error de novo. (*People v. Parker* (2022) 13 Cal.5th 1, 66; *People v. Rivera* (2019) 7 Cal.5th 306, 326.) "'In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled.'" (*People v. Tran* (2022) 13 Cal.5th 1169, 1199; accord, *People v. Holmes*, *McClain and Newborn*, *supra*, 12 Cal.5th at p. 791.) We assume "jurors are intelligent and well able to understand and integrate all the instructions given." (*People v. Holmes*, *McClain and Newborn*, at p. 791.)

### C. Applicable Law

"For [a] killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation.] To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable. [Citations.] As the

72.

Legislature has stated, '[T]he circumstances must be sufficient to excite the fears of a reasonable person….' (… § 198; see also § 197, subds. 2, 3.) Moreover, for either perfect or imperfect self-defense, the fear must be of imminent harm. 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.' [Citation.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082, fn. omitted.)

"Although the belief in the need to defend must be objectively reasonable, a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge….' (CALJIC No. 5.50.) It judges reasonableness 'from the point of view of a reasonable person in the position of defendant….' [Citation.] To do this, it must consider all the '"'facts and circumstances … in determining whether the defendant acted in a manner in which *a reasonable man* would act in protecting his own life or bodily safety.'"' [Citation.] As we stated long ago, '… a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind….' [Citation.]" (*People v. Humphrey*, *supra*, 13 Cal.4th at pp. 1082–1083.)

### D.   Analysis

Defendant asserts "[t]he instructions given to [the] jury, holding him to an adult standard of reasonableness, were erroneous." He contends his trial "was rendered fundamentally unfair, depriving him of due process, and the right to a reliable jury verdict" because the court had a sua sponte duty to instruct the jury to consider defendant's youth as a factor in determining whether he subjectively believed in the need to use deadly force, and whether his belief was objectively reasonable. He asserts, the lack of such an instruction lessened the prosecution's burden of proof and prejudiced him. He relies heavily upon *J.D.B. v. North Carolina* (2011) 564 U.S. 261, 271–276, in which the United States Supreme Court held youth is relevant to an objective "custody" determination in a *Miranda v. Arizona* (1966) 384 U.S. 436 analysis. He also cites to

73.

*Roper v. Simmons* (2005) 543 U.S. 551 and *Graham v. Florida* (2010) 560 U.S. 48, arguing these decisions emphasize "the vulnerabilities of juveniles" and support his argument the jury should have been instructed to consider youth as a factor in considering perfect and imperfect self-defense. The People disagree with defendant's contention and argue the jury was correctly instructed with CALCRIM Nos. 505 and 571 and any modification or additional instruction required a request from defense counsel, which was not made. They assert "the jury knew that it should evaluate [defendant's] actual belief in the need to use lethal force from his perspective, which necessarily included factors specific to him, such as his youth."

In supplemental briefing, defendant cites new legislation to argue "youth has become a significant factor in many arenas." He argues, "lawmakers and courts are recognizing the profound developmental differences between youthful and adult offenders, and changing laws to afford consideration of youth," and that research "should be considered when an adolescent's state of mind is called into question in situations such as perfect or imperfect self-defense, where jurors are called upon to view the situation through the eyes of the defendant." He notes the passage of Welfare and Institutions Code section 625.6, which requires minors under 16 (now 17) to be allowed to consult with counsel before the police conduct a custodial interrogation; Assembly Bill No. 124 (2021–2022 Reg. Sess.), which requires prosecutors to consider whether "[t]he person is a youth, or was a youth at the time of the commission of the offense" (§ 1016.7) in plea bargaining and, in conjunction with Senate Bill No. 567 (2021–2022 Reg. Sess.), requires the imposition of the lower term when certain specified circumstances exist, such as youth, unless contrary to the interests of justice; Senate Bill No. 383 (2021–2022 Reg. Sess.), which authorizes, in part, a juvenile court receiving a delinquency case transferred from another county to determine whether an eligible minor is suitable for deferred entry of judgment even if the transferring court did not; Assembly Bill No. 624 (2021–2022 Reg. Sess.), which makes an order transferring a minor from juvenile court to adult

74.

criminal court an appealable order; Senate Bill 81, which requires a court to "afford great weight" to youth, childhood trauma, and other factors in exercising discretion to strike enhancements; and the upholding of Senate Bill No. 1391 (2017–2018 Reg. Sess.), which provides a minor must be at least 16 years old to be tried in adult court.[9]

### 1. Forfeiture

Here, defendant forfeited his claim of instructional error because he failed to object to the given self-defense instructions or request amplification or modified instructions below. And the trial court correctly instructed on the applicable general principles of law.

The self-defense instruction directed the jury to consider "all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed." (CALCRIM No. 505.) The voluntary manslaughter instruction similarly directed the jury to "consider whether a person of average disposition, in the same situation and knowing the same facts [as defendant], would have reacted from passion rather than from judgment." (CALCRIM No. 570.) Those instructions accurately and completely stated the governing principles. (See *People v. Humphrey*, *supra*, 13 Cal.4th at pp. 1082–1083, 1087; *People v. Jones* (2014) 223 Cal.App.4th 995, 999–1001.) Thus, the court had no sua sponte duty to amplify those instructions with further information not "so closely and openly connected with the facts before the court as to come within the court's sua sponte instructional obligations." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 101 [trial court's failure to inform jury it could consider defendant's battered woman syndrome in assessing whether she perceived imminent harm from victim did not fall

---

[9]He also contends, "in the context of youthful offender parole hearings under section 3051," there has "been a growing consensus that the Legislature should revisit where it has drawn the line with section 3051, subdivision (h), and reconsider whether a youthful offender who was sentenced to [life without the possibility of parole] for a crime committed at an age while cognitive brain development was still ongoing should be afforded the possibility of release like those under 18 years old at the time of their offense."

within court's sua sponte instruction obligation].) To the extent defendant wanted additional instructions, he was required to object to the given instructions and request amplification, which he did not do. (See *People v. Jones* (2013) 57 Cal.4th 899, 969 ["'[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language'"]; *People v. Lee*, *supra*, 51 Cal.4th at p. 638 ["[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal"].) Irrespective, as discussed further below, we conclude defendant's claim fails on its merits.

### 2. *Claim of Instructional Error as to Objective Reasonableness of Belief in Need for Self-defense*

First, we reject defendant's contention that the instructions should have been modified to inform the jury to consider his youth when considering whether his belief in the need for self-defense was objectively reasonable. In support of his argument, defendant relies heavily upon *J.D.B. v. North Carolina*, *supra*, 564 U.S. 261, in which the United States Supreme Court held youth is relevant to an objective "custody" determination in a *Miranda* analysis. Specifically, *J.D.B.* held that, "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test." (*J.D.B.*, *supra*, at p. 277.) However, *J.D.B.* did not discuss, let alone mandate, that any type of jury instruction be given to a jury. And we have found no other case requiring a court to modify the standard jury instructions on self-defense and imperfect self-defense to account for a defendant's age in assessing the objective reasonableness of a defendant's belief in the need for self-defense. Rather, CALCRIM Nos. 505 and 571 correctly state the law, and the trial court had no

76.

sua sponte duty to modify them as defendant contends. (See *People v. Lopez* (2011) 199 Cal.App.4th 1297, 1306 ["CALCRIM Nos. 505, 571, and 604 correctly stated the law"].)

Indeed, while the California Supreme Court has approved of the consideration of evidence of a defendant's situation and knowledge in considering the objective reasonableness of his or her beliefs, it has reiterated that the "ultimate question" is what a reasonable person would have believed. In *People v. Humphrey*, the California Supreme Court held the trial court prejudicially erred in instructing the jury it could only consider evidence related to battered woman's syndrome in deciding whether the defendant actually believed she needed to kill in self-defense, but that same evidence could not be considered or used in evaluating the objective reasonableness requirement for perfect self-defense.[10] (*People v. Humphrey*, *supra*, 13 Cal.4th at pp. 1076–1077, 1081, 1086–1087.) The *Humphrey* court made clear, however, that even though the jury must consider a defendant's situation and knowledge—which makes evidence pertinent to the defendant's situation and knowledge relevant—"the ultimate question is whether a reasonable *person*, not a reasonable battered woman, would believe in the need to kill to prevent imminent harm." (*Id.* at p. 1087.) In so holding, the court noted it was not "changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard." (*Ibid.*) And its decision would not, "in another context, compel adoption of a '"reasonable gang member" standard.'" (*Ibid.*)

Citing the instruction in *People v. Humphrey* as a "model," defendant contends the jury should have been instructed, "Evidence regarding [defendant]'s youth has been introduced in this case. Such evidence may be considered by you for the purpose of determining whether or not the defendant actually believed it was necessary to kill in self-defense, a requirement for both perfect and imperfect self-defense, and whether the

---

**10**In *Humphrey*, the jury convicted defendant of voluntary manslaughter and acquitted her of murder. (*People v. Humphrey*, *supra*, 13 Cal.4th at p. 1082.)

defendant's belief was objectively reasonable, taking into consideration the defendant's age and perception." But this is not what *Humphrey* requires.

Rather, *Humphrey* establishes that, even if evidence of the defendant's youth was admitted, a court does not err in failing to "replac[e] the reasonable 'person' standard," when instructing on self-defense. (*People v. Humphrey*, *supra*, 13 Cal.4th at p. 1087 [reiterating the "ultimate question is whether a reasonable *person* … would believe in the need to kill to prevent imminent harm"]; accord, *People v. Sotelo- Urena* (2016) 4 Cal.App.5th 732, 751–752 [admitting expert testimony regarding dangers associated with chronic homelessness does not create a "reasonable homeless person" standard]; see *People v. Jefferson* (2004) 119 Cal.App.4th 508, 519 ["a reasonable person is not one who hears voices due to severe mental illness" but a "'normal person'"].) And, unlike in *Humphrey*, the court did not instruct the jury it could *not* consider defendant's age or youth in evaluating his situation and knowledge in considering whether the use of self-defense was objectively reasonable. Rather, the court instructed the jury, in accordance with CALCRIM No. 505: "When deciding whether the defendant's belief was reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed."[11] Thus, the instructional error at issue in *Humphrey* is not present here. Put differently, defendant's cited authorities do not support his contention that the objective standard—how a reasonable person would have perceived the risk—should have been turned into a subjective one. Rather, *Humphrey* and *Sotelo-*

---

[11]Notably, defendant contends the instructions held him to "an adult standard of reasonableness." But, as noted, and contrary to defendant's contention, the instructions told the jury, in considering the reasonableness of defendant's actions, to consider "what a *reasonable person in a similar situation with similar knowledge* would have believed" (italics added); this is not the same as telling the jury to consider what a "reasonable adult" would have believed.

*Urena* support our rejection of defendant's contention.[12]  (See *People v. Humphrey*, *supra*, at p. 1087.)

Defendant relies primarily on authority related to *punishment* of juvenile offenders in support of his proposition.  (E.g., *Graham v. Florida*, *supra*, 560 U.S. 48, *Roper v. Simmons*, *supra*, 543 U.S. 551; Senate Bill 81; Assembly Bill No. 124 (2021–2022 Reg. Sess.); § 3051.)  However, none of these cases or legislative developments purport to change the *elements* of an offense, and we have found no case that extends them for that purpose.  Thus, the cited authorities are inapposite.

Irrespective, defendant was not prejudiced by the lack of such an instruction.  The alleged erroneous instruction would only be potentially prejudicial if the jury found defendant actually believed in the need for self-defense.  But here, the jury concluded beyond a reasonable doubt that defendant did not actually believe in the need for self-defense because it convicted him of murder, not voluntary manslaughter.  Having so found, the jury was not required to determine whether any such belief was reasonable.

---

[12]Defendant also cites to *People v. Mathews* (1994) 25 Cal.App.4th 89 (*Mathews*) in support of his contention.  However, *Mathews* is also inapposite.  In *Mathews*, an elderly, vision- and hearing-impaired defendant brandished a shotgun when officers executed a search warrant on his home.  (*Id.* at p. 94.)  The *Mathews* court held the trial court's refusal to grant the defendant's request for a pinpoint instruction that would have informed the jury that "'[i]n considering the self-defense issues, [it] must take into account any sensory impairment the defendant had in determining how a reasonable person with such disabilities would have acted.'" (*Id.* at pp. 98–99.)  The *Mathews* court held the refusal to give the pinpoint instruction was error because it made "no sense, either in law or logic, to hold appellant to the standard of a reasonable person *with* normal eyesight and hearing." (*Id.* at p. 99.)  The court explained that "[w]hat is 'apparent' to a reasonable person who can see and hear is not 'apparent' to a person who is blind and hearing impaired." (*Id.* at p. 100.)  Accordingly, the *Mathews* court imported a rule of tort law and stated, "While the objective reasonable person standard remains, it is the reasonable person with a similar physical disability." (*Id.* at p. 99.)

Here, as discussed, defendant did not request a pinpoint instruction or modification of the standard jury instructions on self-defense and imperfect self-defense; so the posture of this case is different from that in *Mathews* as we are considering whether the court had a *sua sponte duty* to provide an additional instruction on the jury's consideration of youth in evaluating the objective reasonableness of the belief in the need for self-defense.  Furthermore, here, defendant did not have a physical disability that prevented him from seeing and hearing the circumstances around him like in *Mathews*.  Thus, the circumstances of this case are distinguishable.

Thus, even under the more rigorous test to assess prejudice articulated in *Chapman v. California* (1967) 386 U.S. 18, we can conclude "beyond a reasonable doubt" that any alleged error by the trial court in failing to specifically instruct the jury to consider defendant's youth in determining the reasonableness of any belief he had in the need to act in self-defense, "did not contribute to the verdict obtained." (*Id.* at p. 24.)

### 3. *Claim of Instructional Error as to Defendant's Actual Belief in Need for Self-defense*

Furthermore, while we agree defendant's age could be considered in assessing what defendant actually believed, we reject defendant's contention that the trial court was required to provide a specific instruction on youth in instructing the jury on how to evaluate whether defendant actually believed in the need to use self-defense. Here, the jury was instructed, "In evaluating the defendant's beliefs, consider all the circumstances as they were known and *appeared to the defendant*." (Italics added.) Implicit in this instruction is a requirement to consider how the situation appeared to defendant given his age. And none of defendant's cited authorities stand for the proposition that a trial court is required to sua sponte instruct the jury further.

Notably, defendant does not argue he was prevented from introducing evidence or presenting argument regarding the effect of his youth or age on his actual perceived need for self-defense or the reasonableness of that belief. (Cf. *People v. Sotelo- Urena*, *supra*, 4 Cal.App.5th at pp. 745–752 [concluding court abused its discretion in excluding expert testimony on "why a chronically homeless individual would experience a heightened fear of aggression" where such evidence was relevant to defendant's actual belief in need to use lethal force and it would assist jury in weighing reasonableness of defendant's belief of imminent harm].) Indeed, during closing argument, defense counsel expressly drew attention to defendant's age, arguing the jury should consider "a reasonable 16 year old in that situation given the stimulus that he was confronted with, was it reasonable for him to react in the way that he did?" Thus, defense counsel expressly informed the jurors of defendant's age and encouraged them to consider it in evaluating defendant's belief in the

need for self-defense.  Accordingly, we also conclude beyond a reasonable doubt that a jury instruction pinpointing defendant's age as a factor to be considered when determining whether he actually believed in the need for self-defense would not have affected the jury's verdict.  (*Chapman v. California*, *supra*, 386 U.S. at p. 24.)

## VII.  Prosecutorial Misconduct

Defendant next argues the prosecutor engaged in prejudicial misconduct during his rebuttal argument.  We disagree.

### A.    Relevant Background

At the end of his rebuttal argument, the prosecutor argued:

> "And we heard that Sergio Cabral was also to some extent a gang member, that he according to the defendant may have been threatening him in the past.  But that doesn't mean that [defendant] should not still be held accountable for what he did. Every life has value, every human being has value.  We don't know what would have happened if he had survived, what he could have done with his life. Every single person, whoever they are, does not deserve this.  They do not deserve to be gunned down in front of their home for their loved one to come outside to have to turn over their body.  It's—it's not—it's not right.

> "And what I'm asking is that you hold [defendant] accountable. That you send a message that we will not allow this type of violence on our streets in Kings County.  That … this is a community that will not tolerate gang violence, and I would ask that you find him guilty of all counts, thank you."

Defense counsel did not object to the referenced argument.

The court instructed the jury:  "Remember if either attorney misstates the evidence or law, you will rely on the evidence as presented in the trial and the law as stated to you by me."

### B.    Standard of Review

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial

fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; see *People v. Mendoza* (2007) 42 Cal.4th 686, 700; *People v. Farnam* (2002) 28 Cal.4th 107, 167.) "The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor." (*People v. Mendoza*, *supra*, at p. 700.) "'A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.'" (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

"'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.'" (*People v. Hill* (1998) 17 Cal.4th 800, 820.) An exception is made if a timely objection or request for admonition would have been futile, or if an admonition would not have cured the harm caused by the misconduct. (*Ibid.*) "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.'" (*People v. Green* (1980) 27 Cal.3d 1, 27, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 241.)

### C. Analysis

Defendant argues the prosecutor committed misconduct "by calling upon the jury to fill a greater societal goal by finding [defendant] guilty," depriving defendant of due process and rendering his trial fundamentally unfair. He asserts, the prosecutor's argument "improperly invited the jury to convict" him "'"in order to protect community values, preserve civil order, or deter future lawbreaking,"'" and it "was contrary to the principles set forth in *U.S. v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, 1149." He

contends, if the error was forfeited based on his counsel's failure to object, his counsel was ineffective on that basis and reversal is still required.

Initially, defendant's claim is forfeited because he did not object to the referenced argument he now challenges on appeal. "'"As a general rule, a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety."'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894; accord, *People v. Valencia* (2008) 43 Cal.4th 268, 281; *People v. Samayoa* (1997) 15 Cal.4th 795, 841; *People v. McDowell* (2012) 54 Cal.4th 395, 436.) Here, defendant acknowledges his counsel did not object to the referenced argument below. Accordingly, the trial court had no opportunity to rule on the issue. Thus, the issue is forfeited on appeal. However, because defendant asserts his counsel was ineffective in failing to object, we proceed to the merits of his claim and also reject it on that basis.

Here, we cannot conclude the prosecutor's referenced comments, in context, amounted to misconduct. It is not misconduct for a prosecutor to reiterate that the jury's function is to determine whether the defendant has broken any laws. (See *People v. Covarrubias*, *supra*, 1 Cal.5th at p. 894.) To that end, it was not misconduct for the prosecutor to tell the jury to hold defendant accountable for his actions. Additionally, the prosecutor's statement to the jury "to send a message" regarding what the community would tolerate also did not amount to misconduct. The referenced comments were made during the conclusion of the prosecutor's rebuttal argument, which emphasized the jury should convict defendant based on the evidence presented in the case. Thus, the comments, in context, did not divert the jury's attention away from the facts of the case to focus on an external societal issue. Rather, the comments permissibly told the jurors they were tasked with weighing the evidence, considering the charges, and ultimately deciding whether defendant had violated any laws and rendering its verdict accordingly. (See

83.

*People v. Covarrubias*, *supra*, 1 Cal.5th at pp. 893–895 [no misconduct where prosecutor told jury its job and "responsibility as jurors is to act as the litmus test, to apply the laws of our society, and to determine what our community will and will not tolerate"].)

The prosecutor here did not discuss the jury's ability to alleviate broader societal problems by rendering a guilty verdict or refer to evidence outside of the record as in the cases defendant relies upon. In *U.S. v. Weatherspoon*, *supra*, 410 F.3d 1142, the Ninth Circuit Court of Appeals held the prosecutor engaged in misconduct in stating: "'Convicting Mr. Weatherspoon is gonna make you comfortable knowing there's not convicted felons on the street with loaded handguns, that there's not convicted felons carrying around semiautomatic,'" and then repeatedly reiterating this point and stating "'finding this man guilty is gonna protect other individuals in this community,'" despite two admonitions by the court that the prosecutor should confine his arguments to "'guilt or not guilt.'" (*Id.* at p. 1149.) The *Weatherspoon* court noted, "'A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.'" (*Ibid.*) The *Weatherspoon* court held the prosecutor's referenced argument in that case "encourage[d] the jury to enter a verdict on the basis of emotion rather than fact." (*Id.* at p. 1150; see *U.S. v. Polizzi* (9th Cir. 1986) 801 F.2d 1543, 1558 [noting it was improper for prosecutor to tell jury it had any obligation other than weighing evidence, but concluding defendant was not prejudiced]; *People v. Gonzales* (2011) 51 Cal.4th 894, 952 [noting prosecutor's invitations to jury to "take the role of a protective family for [the] victim were plainly improper" because it asked the jury "to go

far beyond their role as the arbiters of punishment prescribed by law" in reaching its penalty decision].)

In contrast, here, the prosecutor's argument urged the jury to render a guilty verdict based on the evidence presented in the case. The prosecutor did not argue the jury should convict defendant to protect community values or preserve civil order or for reasons wholly irrelevant to defendant's guilt. (Cf. *U.S. v. Weatherspoon*, *supra*, 410 F.3d at p. 1149.) "'[N]othing prevents the government from appealing to the jurors' sense of justice, or from connecting the point to the victims in the case.' [Citations.] And prosecutors can appeal to jurors' duty to the community. [Citation.] 'Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible.'" (*U.S. v. Hall* (6th Cir. 2020) 979 F.3d 1107, 1122.)

Accordingly, we cannot conclude the prosecutor's statements here improperly inflamed the jury's passions or prejudices. (See *United States v. Alloway* (6th Cir. 1968) 397 F.2d 105, 113 [no misconduct where prosecutor told jury it was "'called upon … to be the world conscience of the community,'" "'to speak out for the community,'" and "'let the John Alloways know that this type of conduct will not be tolerated '"]; see generally *U.S. v. Solivan* (6th Cir. 1991) 937 F.2d 1146, 1152 ["The correlation between the community interest comments and the wider social-political context to a large extent controls the determination of whether an appeal is deemed impermissible because it is calculated to inflame passion and prejudice"].) Rather, none of the challenged remarks "infect[ed] the trial with such unfairness" so as to make defendant's conviction a denial of due process, nor did the prosecutor use "deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales*, *supra*, 25 Cal.4th at p. 44.)

We reject defendant's contention the prosecutor's referenced argument constituted misconduct, and thus do not consider his ineffective assistance of counsel claim.

## VIII. Cumulative Effect of Alleged Errors

Defendant argues there were numerous errors in this case that cumulatively prejudiced him and rendered his trial "grossly unfair." He contends this "was a one-sided trial by a biased jury." We disagree.

> "Under the 'cumulative error' doctrine, we reverse the judgment if there is a 'reasonable possibility' that the jury would have reached a result more favorable to defendant absent a combination of errors. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 ['Under the "cumulative error" doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial.'].) 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."' (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)" (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1216–1217.)

Here, there is no series of prejudicial errors to cumulate. Accordingly, defendant cannot demonstrate the cumulative effect of the alleged errors resulted in prejudice. (See *In re Reno* (2012) 55 Cal.4th 428, 483 ["As noted, claims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate"].)

## IX. Constitutionality of Special Circumstance

Defendant also presents a facial challenge to the constitutionality of the drive-by murder special circumstance, asserting it fails to narrow the class of persons subject to capital punishment. He asserts his argument "is bolstered by the language used in Section 189, defining a first degree drive-by murder, when compared to the drive-by special circumstance." He contends "once the jury finds a defendant guilty of first degree drive-by murder, a true finding on the drive-by special circumstance is a foregone conclusion." Similarly, defendant argues "there is no distinction between the gang enhancement and the gang special circumstance sufficient to pass constitutional muster." He contends, "If the same conduct that constitutes first degree murder with a gang enhancement also subjects one to capital punishment, then the special circumstance fails

to narrow the class of persons subject to capital punishment." Based on established precedent, we reject defendant's contentions; the challenged provisions of section 190.2 do adequately narrow the class of death-eligible defendants.

"To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' [Citations.] Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death.[13] [Citations.] By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition. [Citation.]" (*Lowenfield v. Phelps* (1988) 484 U.S. 231, 244; accord, *Tuilaepa v. California* (1994) 512 U.S. 967, 972 ["the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase.… [T]he aggravating circumstances must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. [Citation.] Second, the aggravating circumstance may not be unconstitutionally vague"].)

"Under California's capital sentencing scheme, the special circumstances perform the narrowing function required by the Eighth Amendment." (*People v. Wilkins* (2021) 68 Cal.App.5th 153, 164.) And the California Supreme Court has consistently and categorically rejected arguments the enumerated list of special circumstances in section 190.2 fails to adequately narrow the class of persons eligible for the death penalty. (See, e.g., *People v. Scully* (2021) 11 Cal.5th 542, 610 ["Section 190.2, which sets forth the special circumstances that render those convicted of murder death eligible, adequately

---

[13]We note, here, as a juvenile offender, defendant was ineligible for the death penalty. (See *Roper v. Simmons*, *supra*, 543 U.S. at pp. 572–573 [adopting categorical rule barring imposition of death penalty on juvenile offenders under the age of 18, rather than permitting consideration of mitigating arguments related to youth on a case-by-case basis].)

narrows the class of those eligible for the death penalty and is not impermissibly broad in violation of the Eighth and Fourteenth Amendments"]; *People v. Reed*, *supra*, 4 Cal.5th at pp. 1017–1018 [reaffirming "state's death penalty scheme does not violate the federal Constitution by failing to sufficiently narrow the class of offenders eligible for the death penalty"]; *People v. Pollock* (2004) 32 Cal.4th 1153, 1196 [noting "'we have held: The special circumstances listed in section 190.2 adequately narrow the class of murders for which the death penalty may be imposed"].) It has also expressly held that "first degree murder liability and special circumstance findings may be based upon common elements without offending the Eighth Amendment. [Citations.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 158; accord, *Lowenfield v. Phelps*, *supra*, 484 U.S. at p. 246 ["the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this [death] sentence constitutionally infirm"]; see *People v. Johnson* (2016) 62 Cal.4th 600, 636 [Cal. Supreme Court's previous opinions support the conclusion that even if lying-in-wait special circumstance were "*identical* to lying-in-wait first degree murder," it nevertheless "would satisfy federal constitutional requirements for death eligibility"].) Thus, it is not unconstitutional for a special circumstance to duplicate elements of the offense of which the defendant is convicted. (See *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 164 [relying upon *Lowenfield* to conclude defendant's contention "that section 190.2(a)(21) contains a constitutional infirmity simply because it duplicates the elements which defined defendant's murder as … first degree murder … has already been decided to have no merit"]; *People v. Wilkins*, *supra*, 68 Cal.App.5th at p. 165 ["As our Supreme Court has made clear, overlapping culpability and special circumstance elements—even identical ones—do not offend the Eighth Amendment"].)

Accordingly, we reject defendant's contentions that the challenged special circumstances are unconstitutional. Rather, because section 190.2, subdivision (a)(21) and (22) applies only to subclasses of murderers, not to all murderers, there is no merit to

defendant's contention that they fail to adequately narrow the class of death-eligible defendants. (See *People v. Beames, supra*, 40 Cal.4th at p. 934.)

## X.    Assembly Bill 333

In supplemental briefing, defendant asserts the gang special circumstance and the gang enhancement (§ 186.22, subd. (b)(1)(c), (b)(5)) must be reversed based on changes made to section 186.22 by the enactment of Assembly Bill 333. We agree with defendant and conclude he is entitled to reversal of the gang enhancement and gang special circumstance, which the People are entitled to retry under the amended law.

### A.    Statutory Changes to Section 186.22 and Enactment of Section 1109

While defendant's appeal was pending, the Legislature enacted Assembly Bill 333, the STEP Forward Act of 2021, which, in part, amends section 186.22 to impose new substantive and procedural requirements for gang allegations. The legislation went into effect on January 1, 2022.

First, Assembly Bill 333 amended the definition of a "'criminal street gang,'" requiring proof that the gang is an ongoing, *organized* association or group of three or more persons, whose members *collectively* engage in, or have engaged in, a pattern of criminal activity (§ 186.22, subd. (f)). Next, the law created a stricter requirement for proof of "'a pattern of criminal gang activity,'" which is necessary to prove that the group with which the defendant is associated is indeed a criminal street gang. (See § 186.22, subds. (e)–(f).) Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another. (See former § 186.22, subd. (e).) Under the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses. (§ 186.22, subd. (e)(2).) In addition, the last of the predicate offenses must have "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed." (§ 186.22, subd. (e)(1).) The predicate offenses must have been committed

"on separate occasions or by two or more members," and must have been for the "common[] benefit[] [of] a criminal street gang," and "the common benefit from the offenses is more than reputational." (*Ibid.*) Assembly Bill 333 also narrowed the list of offenses that may be used to establish a pattern of criminal gang activity (compare former § 186.22, subd. (e)(1)–(33) with current § 186.22, subd. (e)(1)(A)–(Z)). Additionally, it defines "to benefit, promote, further, or assist" throughout section 186.22 to mean "to provide a common benefit to members of a gang where the common benefit is more than reputational." (*Id.*, subd. (g).) The legislation notes examples of a common benefit that are more than reputational "may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (*Ibid.*)

Finally, Assembly Bill 333 adds section 1109, which requires bifurcation of gang enhancements charged under section 186.22, subdivision (b) or (d) to be tried separately from the underlying charges upon request from the defense. (Stats. 2021, ch. 699, § 5.) Section 1109 also requires that the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)) be tried separately from all other counts that do not require gang evidence as an element of the crime (§ 1109, subd. (b)).

## B. Defendant Is Entitled to Reversal of His Gang Enhancement

In *People v. Tran*, *supra*, 13 Cal.5th 1169, the California Supreme Court held Assembly Bill 333's amendments to section 186.22 altering the substantive requirements necessary to prove the substantive gang offense and gang enhancements operate retroactively under the rule of *In re Estrada* (1965) 63 Cal.2d 740. (*Tran*, *supra*, at p. 1207.) The *Tran* court explained, "*Estrada* 'stand[s] for the proposition that (i) in the absence of a contrary indication of legislative intent, (ii) legislation that ameliorates punishment (iii) applies to all cases that are not yet final as of the legislation's effective date.' [Citation.] *Estrada* applies to statutory amendments 'which redefine, to the benefit of defendants, conduct subject to criminal sanctions.' [Citation.] Here,

90.

'Assembly Bill 333 essentially adds new elements to the substantive offense and enhancements in section 186.22—for example, by requiring proof that gang members 'collectively engage' in a pattern of criminal gang activity, that the predicate offenses were committed by gang members, that the predicate offenses benefitted the gang, and that the predicate and underlying offenses provided more than a reputational benefit to the gang.…' [Citations.] These changes have the effect of 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement,' with obvious benefit to defendants like Tran. [Citation.]'" (*People v. Tran*, *supra*, at pp. 1206–1207.) Accordingly, it is undisputed defendant may seek the benefit of Assembly Bill 333's amendments to section 186.22.

Due to the changes to section 186.22, defendant asserts he is entitled to reversal of his gang enhancement (§ 186.22, subd. (b)). He asserts the evidence was insufficient to prove the predicate offenses under Assembly Bill 333's new requirements. Specifically, defendant argues, "[w]hile there was evidence of predicate offenses offered at trial, the evidence did not establish that they 'commonly benefited a criminal street gang, and the common benefit of the offense [was] more than reputational.'" He also contends the People did not prove the benefit to the gang from the commission of the current offense was more than reputational. He contends Investigator Segura testified to many ways in which the crime could benefit a gang, but he testified more than once the benefit to the gang was reputational. Accordingly, citing *People v. Sek* (2022) 74 Cal.App.5th 657, 668, in support, he contends we cannot be sure the jury did not rely on reputational benefit to the gang as its basis for finding the enhancement true. Defendant also asserts the predicate offense committed by Alfredo Ayala alone does not qualify as a predicate offense or evidence of a pattern of criminal gang activity under the current statute. The People disagree with defendant's contentions, asserting there "is overwhelming evidence showing that the predicate and current offenses were committed for the 'common benefit' such that the jury would have still found true the enhancement(s)." They assert the

offense involving Cesar Tadeo and Juan Flores related to an assault on a rival gang member and the current offense involved defendant targeting a rival gang member in retaliation. Accordingly, they assert the "common benefit to the gang of these crimes is self-evident from the facts of the crimes themselves" and "[n]o expert testimony was necessary to explain that attacking a rival gang member, especially in retaliation, would commonly benefit members of a gang," so a jury "undoubtedly would have found this element satisfied under [Assembly Bill] 333." The People assert the word "collectively" in the statute means the predicate offenses can be established in two ways: "'(1) [by proof that] two different gang members separately committed crimes on two occasions; or (2) [by proof that] two different gang members committed a crime together on a single occasion,'" quoting *People v. Clark* (2022) 81 Cal.App.5th 133, 145, review granted October 19, 2022, S275746. To that end, they disagree with the contention that "collectively" means committed by "more than one person." Accordingly, they contend the predicate offense involving Ayala qualifies as a predicate offense under the amended law.

We agree with defendant's contention that he is entitled to reversal of his section 186.22, subdivision (b) gang enhancement based on the changes to section 186.22. In so concluding, we first note, in his supplemental opening brief and reply, defendant asserts there was evidence the predicate offense committed by Flores and Tadeo involved Tadeo and Flores assaulting a rival gang member.[14] However, the record does not support this conclusion. While defendant cites Officer Avila's testimony and the juvenile wardship petitions and related dispositions in support of this contention, the trial court sustained objections to the referenced portions of Officer Avila's testimony in which he testified Tadeo and Flores "assaulted a rival gang member." Also, neither the wardship petitions

---

[14]In their response brief, the People rely on the statements in defendant's brief and the same portions of the record to assert defendant concedes the evidence supports a conclusion the predicate offense related to Tadeo and Flores involved "assaulting a rival gang member." They cite to no other evidence or portion of the record as evidence of this "fact."

nor dispositions establish this fact. And there is no other evidence in the record to support this fact. Rather, the record is devoid of evidence the offense involving Tadeo and Flores involved them attacking or assaulting a rival gang member. And, while Officer Segura testified generally about the ways crimes can benefit a gang, there was no expert testimony regarding how the specific predicate offenses at issue benefitted the gang in a way that was more than reputational. There was also no evidence regarding the facts underlying Ayala's attempted murder conviction or expert testimony about that crime such that the jury could conclude that offense provided a common benefit to the Tiny Locos Sureños that was more than reputational. Thus, our review of the record does not establish a basis from which to conclude the offense involving Tadeo and Flores and/or the predicate offense involving Ayala benefitted the gang in a way that was more than reputational.

Accordingly, the evidence presented at trial was insufficient to establish "a pattern of criminal gang activity" and, thus, a "criminal street gang" as necessary to sustain defendant's gang enhancement pursuant to amended section 186.22. (See § 186.22, subds. (e), (f).) As a result, we need not reach defendant's further contentions that there was insufficient evidence that all the predicate offenses were committed "collectively" as required under the amended law[15] or that the current offense commonly benefited the

_____

[15]We note there is a dispute among the courts of appeal on whether an offense committed by a lone actor can be used as a predicate offense to establish a pattern of criminal gang activity, and the issue is currently pending in the California Supreme Court in *People v. Clark, supra*, 81 Cal.App.5th 133, review granted. (Cf. *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1088–1089 ["we read the term 'collectively' in a commonsense manner to mean what it says—committed by more than one person, and not, as argued by the People, individually but on a different day"]; *People v. Lopez* (2021) 73 Cal.App.5th 327, 344–345 [noting Assembly Bill 333 requires "prosecution to prove collective, not merely individual, engagement in a pattern of criminal gang activity" and reversing gang-related enhancements and special circumstance because no evidence was introduced at trial to establish crimes committed by individual gang members constituted collective criminal activity by the gang]; *People v. Clark, supra*, at p. 144 [because amended § 186.22 provides "multiple members of the gang must be involved in the pattern of criminal gang activity, the plain meaning of the phrase 'the offenses were committed on separate occasions or by two or more members' means there are two options for establishing the requisite pattern: (1) prove two different gang members separately committed crimes on two

Tiny Locos Sureños and the common benefit was more than reputational.[16] (See § 186.22, subd. (e)(1); see also *People v. Lopez, supra*, 73 Cal.App.5th at p. 346 ["Although the People did submit evidence of two predicate offenses that were committed in the new time frame, the People did not prove that the predicate offenses commonly benefitted a criminal street gang and that the benefit was more than reputational"].)

The People are not foreclosed from retrying defendant on the gang enhancement (§ 186.22, subd. (b)) upon remand under the new requirements of amended section 186.22. Put differently, "'[b]ecause we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial.'" (*People v. Sek, supra*, 74 Cal.App.5th at p. 669; accord, *People v. Figueroa* (1993) 20 Cal.App.4th 65, 72 ["Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence"]; see *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory amendment adds an additional

---

occasions; or (2) prove two different gang members committed a crime together on a single occasion"].) Notably, in *People v. Tran, supra*, 13 Cal.5th 1169, the prosecution introduced felony complaints, guilty pleas, minute orders, and other court documents that showed three individuals had pleaded guilty to various crimes and that they were members of a criminal street gang or had committed the crimes for its benefit. (*Id*. at p. 1205.) On appeal, the People conceded the evidence failed to establish the gang members "collectively" engaged in a pattern of criminal gang activity, as required under the amended statute. (*Id*. at p. 1207.) The *Tran* court agreed, concluding "we need not resolve the contours of Assembly Bill 333's collective engagement requirement" because "the jury was not presented with any discernible theory as to how [gang] members 'collectively engage[d] in'" the requisite predicate crimes (§ 186.22, subd. (f)). (*People v. Tran, supra*, at p. 1207.) However, as discussed, we need not discuss this issue further because we are remanding on other grounds.

[16]Based on our conclusion, we also need not address the parties' discussion of whether evidence of the assault offense involving Tadeo and Flores amounted to a single offense or two predicate offenses.

element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand"].)

> **C.  Assembly Bill 333 Requires Reversal of the Gang Special Circumstance**

Defendant argues the gang special circumstance must also be reversed because of the changes enacted by Assembly Bill 333. The People disagree, asserting "[Assembly Bill] 333's amendment to section 186.22, subdivisions (e) and (f), appears to be an unconstitutional amendment to the gang-murder special circumstance created by the voters via Proposition 21." We agree with defendant the Assembly Bill 333's amendments apply to the section 190.2, subdivision (a)(22) finding and reverse the gang special circumstance on that basis.

Section 190.2, subdivision (a)(22) was enacted as part of Proposition 21, an initiative measure adopted by the electorate in the March 2000 primary election. (*People v. Shabazz* (2006) 38 Cal.4th 55, 64–65.) Section 190.2, subdivision (a)(22) makes first degree murder a capital crime if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, *as defined in subdivision (f) of Section 186.22*, and the murder was carried out to further the activities of the criminal street gang." (Italics added.)

There is a split of authority on whether applying the changes effectuated by Assembly Bill 333 to the gang special circumstance amounts to an unconstitutional amendment to Proposition 21. In *People v. Lopez*, *supra*, 73 Cal.App.5th 327, the Second Appellate District, Division Eight, concluded "Assembly Bill 333's changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22," including section 190.2, subdivision (a)(22). (*Lopez*, at p. 346.) The *Lopez* court held, because "the definition of a criminal street gang has been narrowed by Assembly Bill 333 and new elements added in order to prove a criminal street gang and a pattern of criminal

activity," the requirements for proving a gang special circumstance under section 190.2, subdivision (a)(22) have likewise changed. (73 Cal.App.5th at p. 347.)

In *People v. Rojas* (2022) 80 Cal.App.5th 542, review granted October 19, 2022, S275835, a divided panel of our district reached the opposite conclusion. (*Id.* at pp. 557–558.) The *Rojas* majority held that "[b]ecause Assembly Bill 333 'takes away' from the scope of conduct that Proposition 21 made punishable under section 190.2" (*id.* at p. 555), "it is unconstitutional to the extent it would amend that initiative" (*id.* at p. 557). The *Rojas* majority relied on the fact that California voters restricted the Legislature's ability to amend the provisions of Proposition 21. (*Rojas*, at p. 555.) The majority reasoned: "While the Legislature was free to amend Proposition 21 …, it could only do so with a two-thirds vote in each house. (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, … § 39, p. 131.) Assembly Bill 333 did not comply with that requirement and therefore cannot amend Proposition 21." (*Rojas*, at p. 555.) As a result, *Rojas* implies that a special circumstance murder allegation under section 190.2, subdivision (a)(22) may be proven based on a different, less restrictive definition of a "criminal street gang" than is found in the current version of section 186.22. (See *Rojas*, at p. 558 [holding "Assembly Bill 333 does not alter the scope or effect of section 190.2, subdivision (a)(22)"].)

In *People v. Lee* (2022) 81 Cal.App.5th 232, review granted October 19, 2022, S275449, Division Four of the Second Appellate District concluded Assembly Bill 333 does not unconstitutionally amend section 190.2, subdivision (a)(22). Focusing on the question of voter intent, the *Lee* court opined there is "nothing to suggest that the electorate intended to impose a time-specific incorporation of the term 'criminal street gang' in the gang-murder special-circumstance statute." (*Lee*, at p. 245.) Accordingly, *Lee* holds "that the term 'criminal street gang' as incorporated in the gang-murder special-circumstance statute was 'intended to conform at all times' and 'remain permanently parallel' to section 186.22." (*Ibid.*, quoting *In re Jovan B.* (1993) 6 Cal.4th

801, 816 & fn. 10.)  The *Lee* court further reasoned, the voters reenacted section 186.22, subdivision (f) without substantive change; so "subdivision (f) of section 186.22 cannot be deemed 'among the initiative's statutory provisions' made immune from legislative amendment by force of article II, section 10 of the state Constitution." (*Lee*, at p. 242.) "In short, the voters left intact the Legislature's power to amend the definition of a criminal street gang in section 186.22, subdivision (f)." (*Ibid*.)  And the *Lee* court concluded there was no basis to conclude the voters did not intend to permit any future amendment to 186.22, subdivision (f) to be incorporated into the gang-murder special circumstance.  (*Lee*, at p. 242.)  Rather, "[i]n enacting Proposition 21, the electorate clearly knew how to express the intent to freeze a statutory definition," given the express time-specific incorporations in other sections; but, it did not include a time-specific incorporation of section 186.22, subdivision (f) in section 11 of Proposition 21, the provision supplying the gang-murder special circumstances.  (*Lee*, at pp. 242–243.) Accordingly, "[t]here is simply no basis to believe that the voters understood they were precluding future amendments of subdivision (f) of section 186.22 as referred to in the gang-murder special circumstance, while permitting such future amendments for section 186.22 itself." (*Id*. at p. 243.)

Relatedly, in *People v. Lopez* (2022) 82 Cal.App.5th 1, another panel of our court held Assembly Bill 333 did not unconstitutionally amend the crime of gang conspiracy proscribed by section 182.5, which was enacted as part of Proposition 21.[17]  (*Id*. at p. 21.) Like *Lee*, the *Lopez* court reasoned, in part, that there was no time-specific provision in Proposition 21 for section 182.5 as there was for other provisions of the criminal law. (*Lopez*, at pp. 23–24.)  Accordingly, the *Lopez* court concluded, "[W]e agree with *Lee*'s conclusion that 'the electorate clearly knew how to express the intent to freeze a statutory

---

[17]"[C]ertain elements of the gang conspiracy offense proscribed by section 182.5 are defined by incorporation of provisions that *were* amended by Assembly Bill 333, namely, section 186.22, subdivisions (e) and (f)." (*People v. Lopez*, *supra*, 82 Cal.App.5th at p. 18.)

definition,'" and "[t]he absence of such time-specific language in section 182.5 leads to our rejection of the People's claim." (*Id.* at pp. 24–25.)

Defendant urges us to follow the reasoning in *Lee*, while the People urge us to adopt the *Rojas* court's view. Because review has been granted in both *Rojas* and *Lee*, this issue has not been decided. We, however, agree with and endorse the reasoning of *Lee*. Applying that reasoning here, we conclude the section 190.2, subdivision (a)(22), special circumstance must also be reversed.

## XI.    Firearm Enhancement and Fines and Fees

Defendant contends his case should be remanded for resentencing so the trial court can exercise its discretion to impose a lesser firearm enhancement and so the court can consider his ability to pay before imposing the restitution fine and various fees.[18, 19] With regard to the firearm enhancement, defendant asserts the jury found true three firearm enhancements pursuant to section 12022.53, subdivisions (b), (c), and (d) and, though the court declined to strike the enhancements based on its newfound discretion under Senate Bill No. 620 (2017–2018 Reg. Sess.), the court did not appear to be aware it had discretion to impose a different, lesser firearm enhancement. The People disagree with defendant's contentions.[20]

---

[18]Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, he asserts the "record is devoid of evidence of [his] ability to pay" the $5,000 restitution fine, a $40 court operations fee, and a $30 court security fee. He asserts "he is entitled to relief, and, because this case should be remanded for resentencing on another issue, the trial court can readily conduct an ability-to-pay hearing."

[19]He also contends his counsel was prejudicially ineffective in failing to raise these issues at sentencing.

[20]The People assert the court knew it had discretion to impose a lesser enhancement; it simply chose not to. They argue, had the court "stricken the subdivision (d) enhancement, it would have had to decide what to do with the subdivision (c) enhancement; had it also stricken the subdivision (c) enhancement it would have had to decide what to do with the subdivision (b) enhancement." They further contend defendant's challenge to the restitution fine and certain fees is forfeited because he failed to raise it below. They further note, because the restitution fine was set above the statutory minimum, the statute expressly allows for consideration of ability to pay that fine. Accordingly, defendant was "obligated to challenge the fine on inability to pay grounds, and nothing in the statute or case law made such an objection futile." They

Because we are reversing defendant's gang enhancement and gang-murder special circumstance, a new sentencing or disposition hearing will necessarily result. Accordingly, defendant may raise his remaining claims at resentencing and we need not discuss them further.

## XII. Senate Bill 81

In supplemental briefing, defendant next asserts that at resentencing, he is entitled to seek the benefit of Senate Bill 81, which amended section 1385 "to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Sek*, *supra*, 74 Cal.App.5th at p. 674; see Stats. 2021, ch. 721, § 1.) The People agree that, if remand is required for another reason, the amendments to section 1385 should apply at a future resentencing hearing. We, too, agree that Senate Bill 81's amendments to section 1385 should apply at resentencing.

As modified by Senate Bill 81, section 1385, subdivision (c) now provides, in part:

"(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

"(2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances … are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."

The mitigating circumstances courts are to consider and afford great weight to in considering whether to strike an enhancement include, but are not limited to, whether "multiple enhancements are alleged in a single case" and "[t]he defendant was a juvenile

---

contend, even if the issue was not forfeited, defendant is not entitled to an ability to pay hearing because the restitution fine does not violate either the Eighth Amendment or due process and defendant should be able to pay the imposed fees from his prison wages.

when they committed the current offense or any prior offenses, including criminal convictions and juvenile adjudications, that trigger the enhancement or enhancements applied in the current case." (§ 1385.)[21]  Defendant contends multiple mitigating circumstances apply to his case.

As the parties acknowledge, section 1385, subdivision (c), as amended by Senate Bill 81, provides that it shall apply to sentencings occurring after January 1, 2022, the effective date of Senate Bill 81.[22]  And the People concede, because defendant will be resentenced after the effective date of the legislation, Senate Bill 81's amendments to section 1385 should apply at the resentencing hearing.  We accept the People's concession and conclude defendant may seek the benefit of Senate Bill 81 at resentencing.

## XIII.  Assembly Bill 2361 Requires a Conditional Reversal and Remand

Welfare and Institutions Code section 707 governs the procedures for transferring a minor from juvenile court to a court of criminal jurisdiction.  Effective January 1, 2023, Assembly Bill 2361 amends section 707 of the Welfare and Institutions Code, in part, by increasing the prosecution's burden to prove that such a transfer is appropriate.  Pursuant to the new legislation, Welfare and Institutions Code section 707, subdivision (a)(3) now requires the juvenile court to find by "clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court" before transferring a minor to the jurisdiction of the superior court, and it requires the court to

---

[21]Senate Bill 81 initially codified these provisions under section 1385, subdivision (c)(3)(B) and (c)(3)(G), respectively, but section 1385 was further amended pursuant to Assembly Bill No. 200 (2021–2022 Reg. Sess.) (Assembly Bill 200), effective June 30, 2022, and these provisions were amended to fall under subdivision (c)(2)(B) and (c)(2)(G), respectively.  (Stats. 2022, ch. 58, § 15.)

[22]Pursuant to Senate Bill 81, section 1385, subdivision (c)(7) provided: "This subdivision shall apply to sentencings occurring after the effective date of the act that added this subdivision."  (Stats. 2021, ch. 721, § 1.)  Thereafter, Assembly Bill 200 modified subdivision (c)(7) of section 1385 to state, "This subdivision shall apply to all sentencing occurring after January 1, 2022."  (Stats. 2022, ch. 58, § 15.)  Because Senate Bill 81 became effective January 1, 2022, this modification did not result in a substantive change.

"include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court" in an order entered upon the minutes. (Stats. 2022, ch. 330, § 1, subd. (a)(3).)

Here, defendant's case was initially filed directly in adult criminal court in August 2016. After Proposition 57 was passed in November 2016, the court granted defendant's motion to transfer his case to juvenile court where a contested transfer hearing was held. Defendant was then transferred to adult court in August 2017 where he was tried and convicted.

In supplemental briefing, defendant asserts conditional reversal of the judgment and a remand to the juvenile court is required for a Welfare and Institutions Code section 707 transfer hearing under the new standard in light of Assembly Bill 2361. The People agree with defendant that Assembly Bill 2361 operates retroactively and a conditional reversal and remand is necessary for the juvenile court to hold a transfer hearing at which it applies the new standard. (*In re Estrada*, *supra*, 63 Cal.2d at p. 745.)

Like Proposition 57, Assembly Bill 2361 raises the burden of proof for transferring a juvenile to adult criminal court, among other changes. Thus, Assembly Bill 2361, like Proposition 57, "reduces the possible punishment for a class of persons, namely juveniles." (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303.) Accordingly, we agree with the parties and conclude a conditional reversal of the judgment and remand to the juvenile court is required. The juvenile court is to conduct a transfer hearing pursuant to Welfare and Institutions Code section 707, as amended by Assembly Bill 2361.

## DISPOSITION

The gang enhancement and gang-murder special circumstance are reversed. We also conditionally reverse the remainder of the judgment and remand the matter to the juvenile court with directions to conduct a new transfer hearing at which Welfare and Institutions Code section 707, as amended by Assembly Bill 2361, will apply.

If, after conducting the juvenile transfer hearing, the court determines that it would have transferred the defendant to a court of criminal (adult) jurisdiction then the judgment shall be reinstated as of that date. (Welf. & Inst. Code, § 707.1, subd. (a).) The People must elect whether to retry defendant on the gang enhancement and gang-murder special circumstance. If the People elect not to retry defendant on the gang enhancement and gang-murder special circumstance, the trial court shall modify the judgment by striking defendant's gang enhancement and the gang-murder special circumstance and shall hold a resentencing hearing.

On the other hand, if the juvenile court finds that it would *not* have transferred defendant to a court of criminal (adult) jurisdiction, then it shall treat defendant's conviction and enhancements as juvenile adjudications. The People must elect whether to retry defendant on the gang enhancement and the gang-murder special circumstance. If the People elect not to retry defendant on the gang enhancement and the gang-murder special circumstance, the juvenile court shall strike the defendant's gang enhancement and the gang-murder special circumstance and shall conduct a disposition hearing.


PEÑA, J.

WE CONCUR:


FRANSON, Acting P. J.


SMITH, J.


102.